**NATIONAL TREASURY EMPLOYEES UNION, et al., Appellants**

v.

**UNITED STATES of America, Appellee.**

No. 96–5217.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 25, 1996.

Decided Dec. 13, 1996.

Gregory O'Duden, General Counsel, argued the cause for appellants, with whom Elaine D. Kaplan, Deputy General Counsel, and Barbara A. Atkin, Associate General Counsel, Washington, DC, were on the briefs.

Stephen W. Preston, Attorney, United States Department of Justice, argued the cause for appellee, with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, and Douglas N. Letter, Litigation Counsel, United States Department of Justice, Washington, DC, were on the brief.

Before: SENTELLE, HENDERSON and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge SENTELLE.

Opinion concurring in Part II B filed by Circuit Judge ROGERS.

SENTELLE, Circuit Judge:

The National Treasury Employees Union ("NTEU" or "Union"), its president, and two of its members appeal from the dismissal of their suit challenging the constitutionality of the Line Item Veto Act, Pub.L. No. 104–130, 100 Stat. 1200 (codified at 2 U.S.C. §§ 691–692 (1996)), for lack of Article III standing. We affirm, holding that appellants' alleged injury is neither sufficiently concrete nor imminent to create a justiciable controversy.

## I. Background

This case arises out of an attempt by the NTEU, its president Robert Tobias, and two of its individual members to challenge the constitutionality of the Line Item Veto Act. NTEU is a labor organization representing 140,000 federal employees in various agencies and departments within the executive branch. Like private sector unions, NTEU works to represent employees through such traditional labor union activity as collective bargaining and grievance arbitration. However, because of the nature of public sector employment, in which Congress sets by law most of the key conditions of employment in the workforce, NTEU also seeks to protect its members' employment-related interests in the legislative appropriations process.

The Line Item Veto Act provides that "the President may, with respect to any bill or joint resolution that has been signed into law pursuant to Article I, section 7, of the Constitution of the United States, cancel in whole (1) any dollar amount of discretionary budget authority; (2) any item of new direct spending; or (3) any limited tax benefit." 2 U.S.C. § 691(a). The President must notify Congress of any exercise of his cancellation power under the Act within five calendar days (excluding Sundays) of the enactment of the law containing the canceled item. Id. § 691(a)(3)(B). Congress may then nullify the President's cancellation by passing a "disapproval bill." Id. § 691b(a). Because the disapproval bill may be vetoed by the President, a President's exercise of his cancellation power will stand, as a practical matter, if supported by one-third plus one of the members of either House of Congress.

By its terms, the Line Item Veto Act will not take effect until the earlier of the enactment of a seven-year balanced budget bill or January 1, 1997. Id. § 691 note. Nevertheless, on April 9, 1996, the day the Line Item Veto Act was signed into law, appellants brought suit against the United States in federal district court asking the court to declare the Act unconstitutional and enjoin its enforcement. According to appellants, the Line Item Veto Act violates the separation of powers, U.S. CONST. art. I, §§ 7, 8, the Appropriations Clause, id. § 9, cl. 7, and the grant to each House of Congress of the power to "determine the Rules of its Proceedings," id. § 5.

In their complaint, appellants allege several injuries that they contend are sufficient to satisfy the Article III standing requirement of "injury in fact." First, NTEU alleges that "[a]s a result of the Act, NTEU must modify its representational activities to devote addi-

tional resources—including time, money, and effort—to gain the support of the Executive Branch for measures that will benefit its members." Appellants' Amended Complaint at 8. Second, NTEU alleges that "the Act interferes with NTEU's ability to influence the passage of favorable legislation" by "mak[ing] it more difficult for NTEU to achieve favorable legislative treatment for its constituents without securing the advance support of the Executive Branch" for such legislation. *Id.* at 9. These allegations are supported by an affidavit filed by Robert M. Tobias, National President of NTEU, stating that

> enactment of the Line Item Veto Act has dramatically changed the landscape of the legislative process and thus, necessarily, affects the way NTEU does business regarding appropriations measures of interest to our members.... By transferring the power to make spending decisions from Congress to the President, the regime established by the Line Item Veto Act most certainly impairs the Union's ability to accomplish its key purpose of representing effectively its members' interests in the appropriations process. NTEU's work is so impeded because the unlawful Act creates a new scheme under which benefits achieved though the legislative process can be entirely negated through the President's item veto power.... [T]o counter the new regime established by the Act and to protect against the threat of an item veto, NTEU must now expend additional time and money ... to help ensure that the President does not thwart our legislative advocacy through the item veto.

Tobias Aff. ¶¶ 12, 13.

In addition to the injury inflicted upon the Union, President Tobias alleges that the Line Item Veto Act injures him "as an individual" by impairing his ability "as the elected National President of NTEU ... to advance the interests of the Union." *Id.* ¶ 16. Similarly, two individual members of the Union allege that they "will be injured" because the Line Item Veto Act reduces NTEU's ability to advocate its members' views and requires NTEU to divert resources away from other union services of interest to members. Ap-

pellants' Amended Complaint at 9. Finally, President Tobias and the two individual members of the Union allege that the Line Item Veto Act injures them "in their capacity as voters" in that "their elected representatives' vote has lost value in the lawmaking and rulemaking process." *Id.*

The United States moved to dismiss this action on the alternative grounds that appellants lack standing under Article III of the Constitution and that the matter was "currently nonjusticiable." On July 3, 1996, the district court granted the government's motion to dismiss for lack of Article III standing, reasoning that plaintiffs' alleged injuries are "too speculative and remote" to constitute an "injury sufficient to confer standing on the plaintiffs." *National Treasury Employees Union v. United States,* 929 F.Supp. 484, 488 (D.D.C.1996) (mem.) (hereinafter *NTEU*). While recognizing that "the Act may change the way [NTEU] chooses to represent its members," the court concluded that the Act "does not perceptibly impair [NTEU's] representation efforts." *Id.* The court distinguished the line of cases recognizing "a concrete and demonstrable injury arising from a purportedly illegal action [that] increases the resources the group must devote to programs independent of its suit challenging the action" on the ground that in each of those cases the purportedly illegal action taken by the defendants "was at loggerheads with" and "squarely countered the plaintiffs' organizational objective." *Id.* at 488–89.

The district court further reasoned that the alleged injury to NTEU was not "real and immediate," but instead was "wholly speculative." *Id.* at 489. According to the court, "plaintiffs' ultimate concerns will be realized only in the event that the President exercises the cancellation authority with respect to a particular appropriation affecting them" and Congress is unable to pass a disapproval bill to override the item veto. *Id.* The court rejected NTEU's argument that it was injured by the fact that the item veto authority "places the appropriations process under the Sword of Damocles" to which NTEU must now respond in order to represent its members adequately. *Id.* Be-

cause the President presently has a veto authority that may be exercised "to the detriment of NTEU members," *id.*, the district court was not convinced that the addition of an item veto power would "perceptibly impair the plaintiffs' representation efforts," *id.* at 490.

This appeal challenges the district court's dismissal of appellants' complaint for lack of standing. While appellants purport to argue that NTEU as well as the individual plaintiffs have standing to sue, the only argument seriously advanced is that NTEU has standing to sue on its own behalf. Therefore, we consider only that question. *See Alabama Power Co. v. Gorsuch,* 672 F.2d 1, 7 (D.C.Cir. 1982) (per curiam) ("Courts have long declined to render decisions on important questions of far-reaching significance which have not been argued by the party who might benefit therefrom.").

## II. Analysis

■ Article III of the federal Constitution vests "[t]he judicial Power of the United States ... in one supreme Court, and in such inferior Courts as the Congress may ... establish." U.S. CONST. art. III, § 1. This judicial power extends only to "Cases" and "Controversies." *Id.* § 2. In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed "justiciability doctrines," among which are standing ripeness, mootness, and the political question doctrine. *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). These doctrines are composed both of prudential elements which "Congress is free to override," *see Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.,* 28 F.3d 1268, 1278 (D.C.Cir.1994), and "core component[s]" which are "essential and unchanging part[s] of the case-or-controversy requirement of Article III," *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Two of the justiciability doctrines—standing and ripeness—are implicated in the present case.

■ Article III standing requires that a plaintiff have suffered an (1) "injury in fact— an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"—(2) which is "fairly traceable" to the challenged act, and (3) "likely" to be "redressed by a favorable decision." *Id.* at 560–61, 112 S.Ct. at 2136 (internal quotations and citations omitted). These requirements apply whether an organization asserts standing to sue, either on its own behalf, or on behalf of its members. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982).

■ With respect to the "injury in fact" requirement, an organization suing on its own behalf must demonstrate that it has suffered "concrete and demonstrable injury to [its] activities." *Id.* at 379, 102 S.Ct. at 1124. A mere "setback to the organization's abstract social interests" is inadequate to establish standing. *Id.* Further, the injury alleged cannot be " 'conjectural' or 'hypothetical,' " *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983), "remote," *Warth v. Seldin,* 422 U.S. 490, 507, 95 S.Ct. 2197, 2209–10, 45 L.Ed.2d 343 (1975), "speculative," *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 42–46, 96 S.Ct. 1917, 1926–28, 48 L.Ed.2d 450 (1976), or "abstract," *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). Rather, it must be "certainly impending." *Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 1725, 109 L.Ed.2d 135 (1990) (internal quotations omitted).

■ Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending. *See Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 81, 98 S.Ct. 2620, 2634–35, 57 L.Ed.2d 595 (1978); *DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.,* 887 F.2d 275, 297 (D.C.Cir. 1989) (holding that "the constitutional requirement for ripeness is injury in fact"). It is only the prudential aspect of ripeness— where a court balances "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration," *Abbott Labs. v. Gardner,* 387 U.S.

136, 149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967)—that extends beyond standing's constitutional core. *See Duke Power*, 438 U.S. at 81–82, 98 S.Ct. at 2634–35. In other words, if a threatened injury is sufficiently "imminent" to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied.[1] At that point, only the prudential justiciability concerns of ripeness can act to bar consideration of the claim. We share with the district court the conclusion that the appellants lack Article III standing, at least on the present record; we are utterly convinced that their claim is not prudentially ripe.

### A. *Article III Standing*

■ The starting point for our analysis of NTEU's alleged injury under the standing rubric is the Supreme Court's opinion in *Havens Realty Corp. v. Coleman, supra.* In *Havens*, the Court considered whether a nonprofit organization whose purpose was "to make equal opportunity in housing a reality in the Richmond Metropolitan Area" had standing to bring suit on its own behalf against a realty company for alleged violations of the Fair Housing Act. 455 U.S. at 368, 102 S.Ct. at 1118–19 (internal quotations omitted). The organization alleged that the defendant's unlawful housing practices "frustrated" the organization's efforts "to assist equal access to housing." *Id.* at 379, 102 S.Ct. at 1124 (internal quotations omitted). Further, the organization alleged that it "had to devote significant resources to identify and counteract the defendant's" unlawful housing practices. *Id.* (internal quotations omitted). Accepting these allegations as true, the Court concluded that the organization's "ability to provide counseling and referral services for low- and moderate-income homeseekers" had been "perceptibly impaired," thus creating an injury sufficient for purposes of standing. *Id.* According to the Court, "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

Recently, the Supreme Court revisited the issue of organizational standing in *Metropolitan Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991). There, the Court considered whether an organization whose primary purpose was to "implement a transportation policy for the Washington area that would ... reduc[e] the operations at National [Airport] and alleviat[e] noise, safety, and air pollution problems associated with such operations," *id.* at 262, 111 S.Ct. at 2304–05, had standing to challenge the constitutionality of Congress' delegation to a Board of Review the power to veto airport planning decisions made by the Airports Authority Board of Directors, *id.* at 255, 111 S.Ct. at 2301. The Court recognized the existence of two harms arising from this scheme sufficient to establish Article III standing. The first injury was the increase "in noise, pollution, and danger of accidents." *Id.* at 264, 111 S.Ct. at 2305–06. The Court concluded that this injury was "fairly traceable" to the unexercised veto power "because knowledge that the ... plan was subject to the veto power undoubtedly influenced [the] Board of Directors when it drew up the plan." *Id.* at 265, 111 S.Ct. at 2306. Second, the Court recognized that the veto power harmed the organization by "making it more difficult" for the organization to reduce noise and activity at the airport. *Id.* The Court further concluded that the organization's claim was "ripe" for judicial review despite the fact that the veto power had not been exercised to the organization's detriment. *Id.* at 265 n. 13, 111 S.Ct. at 2306 n. 13. As the Court explained, "[t]he threat of the veto hangs over the Board of Directors like the sword over Damocles, creating a here-and-now subservience to the Board of Review sufficient to raise constitutional questions." *Id.* (internal quotations omitted).

It is important to note that it was not the mere existence of the unconstitutional veto

---

**1.** Of course, the converse is not true. One may be able to demonstrate that an injury is "imminent" (*i.e.*, that the claim is constitutionally ripe), but be unable to demonstrate that the injury is

"concrete and particularized," "fairly traceable" to the challenged action, or "likely to be redressed by a favorable decision."

power in *Metropolitan* that constituted the "injury in fact," but rather the increased (or at least not decreased) noise, activity, and danger that resulted from the unconstitutional veto power. As the Court explained the next term in *Lujan v. Defenders of Wildlife,* a "procedural injury" is inadequate to establish standing absent an alleged "discrete injury" flowing from the procedural violation. 504 U.S. at 571–72, 112 S.Ct. at 2142–43. However, in those cases involving procedural injuries, the standing requirements of redressability and immediacy are applied to the present violation of the procedural right that may someday injure a "concrete interest[ ]," rather than the discrete injury which the plaintiff often cannot establish "with any certainty." *Id.* at 572 n. 7, 112 S.Ct. at 2142 n. 7.

We have previously found organizational standing to exist under facts similar to those that existed in *Havens.* For example, in *Spann v. Colonial Village, Inc.,* 899 F.2d 24 (D.C.Cir.), *cert. denied,* 498 U.S. 980, 111 S.Ct. 508, 112 L.Ed.2d 521 (1990), two nonprofit organizations "dedicated to ensuring equality of housing opportunity through education and other efforts" brought suit against an advertising agency and the owner and manager of a residential condominium development, alleging that the defendants ran discriminatory housing advertisements in the *Washington Post* in violation of the Fair Housing Act. *Id.* at 26. Plaintiffs further alleged that these discriminatory ads required plaintiffs to "devote scarce resources to identify and counteract defendants' advertising practices" and also "necessitated increased education efforts" to inform the public about laws prohibiting discrimination in housing. *Id.* at 28. We held that, because educational programs "could plausibly be required" to counteract defendants' conduct and because these programs would act as a "drain on the organizations' resources," plaintiffs' allegations were sufficient to establish standing to sue. *Id.* at 28–29, 31.

Similarly, in *Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp., supra,* we concluded that the Fair Employment Council ("FEC") had standing to challenge the allegedly discriminatory placement practices of an employment agency, BMC Marketing ("BMC"). 28 F.3d at 1270. FEC alleged that "BMC's discriminatory actions ... interfered with [FEC's community outreach, counseling, and research projects] and programs and ... required the Council to expend resources to counteract BMC's alleged discrimination." *Id.* at 1276. We concluded that these allegations indicated that BMC's alleged discrimination made FEC's "overall task more difficult." *Id.* As we explained, the alleged discrimination by BMC "might increase the number of people in need of counseling; similarly, to the extent that BMC's actions have made it harder for minorities to find jobs in greater Washington, they may have reduced the effectiveness of any given level of outreach efforts." *Id.* This, we said, constituted a "perceptibl[e] impair[ment]" of the FEC programs sufficient to establish "injury in fact." *Id.* (internal quotations omitted). However, we went on to explain that expenses the FEC incurred in detecting the discriminatory practices of BMC were "self-inflicted" harms stemming from the FEC's "own budgetary choices" rather than any conduct of BMC. *Id.* This latter harm, we held, did not constitute an "injury" for purposes of standing. *Id.* at 1277.

As the district court rightly noted, what *Havens, Spann,* and *FEC*—as well as *Metropolitan*—have in common is that the action challenged in those cases "was at loggerheads with the stated mission of the plaintiff." *NTEU,* 929 F.Supp. at 489. We, of course, recognize that conflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing. Frustration of an organization's objectives "is the type of abstract concern that does not impart standing." *National Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1433 (D.C.Cir.1995); *see also Havens,* 455 U.S. at 379, 102 S.Ct. at 1124 (distinguishing injury to an "organization's activities" from "a setback to the organization's abstract social interests"). Individual persons cannot obtain judicial review of otherwise non-justiciable claims simply by incorporating, drafting a mission statement, and then suing on behalf of the newly formed and extremely interested organization.

■ However, in those cases where an organization alleges that a defendant's conduct has made the organization's *activities* more difficult, the presence of a direct conflict between the defendant's conduct and the organization's *mission* is necessary—though not alone sufficient—to establish standing. If a defendant's conduct does not conflict directly with an organization's stated goals, it is entirely speculative whether the defendant's conduct is impeding the organization's activities. Moreover, in those cases where governmental action is challenged, if the government's conduct does not directly conflict with the organization's mission, the alleged injury to the organization likely will be one that is shared by a large class of citizens and thus insufficient to establish injury in fact. *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205.

NTEU alleged a direct causal link between the enactment of the Line Item Veto Act and the increased expenditure of funds now needed to achieve NTEU's organizational mission of improving the terms of employment for government workers. NTEU did not allege that an appropriations bill which would have improved the conditions of employment for government workers was subjected to the President's item veto power. Nor did NTEU allege that such an appropriations bill was modified in Congress as a result of a threatened exercise of the item veto power. Indeed, NTEU did not even allege that such an appropriations bill moved through Congress under this "Sword of Damocles." Plaintiffs allege only that they have expended more money lobbying the President in order to avoid these potential injuries.

But the plaintiff's mission is not to influence the President's views on the rights of government workers. NTEU's mission is to obtain improved worker conditions—a mission not necessarily inconsistent with the Line Item Veto Act. For a myriad of reasons, a given President may be disinclined to exercise the item veto power as to government employee benefits. We do not and cannot know at this point. Absent a direct conflict between NTEU's mission and the Line Item Veto Act, we are unsure whether NTEU's additional expenditure of funds is truly necessary to improve the working conditions of government workers or rather is unnecessary alarmism constituting a self-inflicted injury.

■ It is true that, "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint." *Metropolitan,* 501 U.S. at 264, 111 S.Ct. at 2306 (internal quotations and citations omitted). But there is a difference between accepting a plaintiff's allegations of fact as true and accepting as correct the conclusions plaintiff would draw from such facts. NTEU would have us accept as true not only the fact that it has expended additional funds in an attempt to lobby the President more effectively, but also the speculative conclusion that such expenditures are a necessary link in achieving the organization's ultimate purpose. This we decline to do.

### B. *Ripeness*

#### 1. Article III

■ Even were we to accept NTEU's alleged conclusion that the Line Item Veto Act necessitates increased lobbying efforts directed at the President, we do not believe this alleged injury is sufficiently imminent to create a current justiciable controversy. As *Lujan* makes clear, Article III requires not only that an alleged injury be "concrete and particularized," but also that it be "imminent." In *Havens, Metropolitan, Spann,* and *Fair Employment Council,* the allegedly unlawful and injurious act had already occurred by the time suit was brought. In *Havens,* the plaintiff organization brought suit challenging "racial steering" practices in which defendants had already engaged. *See* 455 U.S. at 366, 102 S.Ct. at 1117–18. The same was true in both *Spann,* 899 F.2d at 26 (challenging discriminatory ads run in the *Washington Post* from January 1985 through the spring of 1986), and *Fair Employment Council,* 28 F.3d at 1270 (challenging defendants' failure to provide referrals for black employees in December 1990).

We recognize that in cases like this one where a procedural violation is asserted, the courts have applied the imminence requirement to the procedural violation, not the

discrete injury that might someday flow from such. *Lujan,* 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7. For example, a plaintiff who lives

> adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Id.* Similarly, in *Metropolitan,* where the Court concluded that increased airport noise was traceable to an *unexercised* veto power, 501 U.S. at 264–65, 111 S.Ct. at 2305–06, the Board of Directors had adopted a master airport plan and the Board of Review had voted not to disapprove that plan by the time suit was brought, *id.* at 261, 111 S.Ct. at 2304.

In this case, NTEU concedes that "[t]he President ... cannot exercise his veto power until January 1, 1997." Appellants' Brief at 11–12. While the *Metropolitan* Court recognized that the existence of even an unexercised veto may "creat[e] a 'here-and-now subservience' ... sufficient to raise constitutional questions," 501 U.S. at 265 n. 13, 111 S.Ct. at 2306 n. 13, in this case the veto power is not only unexercised, but is as yet unavailable. Nor is an appropriations bill subject to the item veto pending before Congress. We do not mean to imply that NTEU's alleged injury will be sufficiently imminent on January 1 or on the evening of the State of the Union address when the President submits his budget to Congress. It is enough to say that NTEU's claim is not now ripe, particularly when we subject the claim to analysis under the prudential aspect of the ripeness doctrine.

### 2. Prudential

■ Prudentially, the ripeness doctrine exists to prevent the courts from wasting our resources by prematurely entangling ourselves in abstract disagreements, and, where, as here, other branches of government are involved, to protect the other branches from judicial interference until their decisions are formalized and their "effects felt in a concrete way by the challenging parties." *Abbott Labs.,* 387 U.S. at 148–49, 87 S.Ct. at 1515. In testing whether the facts of a particular case meet that standard of ripeness, we have often applied a two-part analysis, evaluating "[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515; *accord NRDC v. EPA,* 859 F.2d 156, 166 (D.C.Cir.1988). Taking the questions in reverse order, the only alleged hardship to the parties of withholding immediate judicial review is that the appellants, allegedly, will divide their resources differently between their lobbying efforts toward the Congress—still virtually as involved in the budget making process as ever—on the one hand, and the President—who always had a veto, but now has a stronger one—on the other. Whatever is on the other side of the scale need not be very heavy to outweigh this light hardship. As for the current fitness for judicial review, while the broad legal theory advanced by appellants may be as complete as it ever will, the facts upon which its resolution may depend are not "fully crystallized," nor do the appellants feel their effects in a concrete way. *Id.*

■ Further supporting our decision that this case is prudentially unripe is the usually unspoken element of the rationale underlying the ripeness doctrine: If we do not decide it now, we may never need to. Not only does this rationale protect the expenditure of judicial resources, but it comports with our theoretical role as the governmental branch of last resort. *Allen,* 468 U.S. at 752, 104 S.Ct. at 3325. Article III courts should not make decisions unless they have to.

Relying on our opinion in *Fair Employment Council,* the parties seem to agree that prudential justiciability limitations do not bar consideration of a challenge to the Line Item Veto Act. In *Fair Employment Council,* we held that a federal statute which permitted "any 'person claiming to be aggrieved' by an unlawful employment practice to file suit," 28 F.3d at 1278 (quoting 42 U.S.C. § 2000e–5(f)(1)), "open[ed] the courts to anyone who satisfie[d] the constitutional requirements" of Article III, *id.* In the Line Item Veto Act,

Congress specified that "any individual adversely affected by [the Act] may bring an action, in the United States District Court for the District of Columbia, for a declaratory judgment and injunctive relief on the ground that any provision of this part violates the Constitution." 2 U.S.C. § 692(a)(1). Although when taken out of context that provision seems to parallel the one we considered in *Fair Employment Council,* further examination reveals otherwise.

2 U.S.C. § 692(b) provides that any order entered pursuant to the judicial review provision of the Act is reviewable by direct appeal to the Supreme Court, not this court. We believe this provision constitutes a congressionally created barrier to our review of appellants' claim. Just as Congress may override prudential barriers to judicial review, *Fair Employment Council,* 28 F.3d at 1278, so too, may it deny a court the authority to review a case or class of cases otherwise within the Article III judicial power. As the Supreme Court has stated:

[T]he judicial power of the United States ... is ... dependent for its distribution and organization, and for the modes of its exercise, entirely upon the action of congress, who possess the sole power of creating the tribunals (inferior to the supreme court) for the exercise of the judicial power, and of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to congress may seem proper for the public good.

*Cary v. Curtis,* 44 U.S. (3 How.) 236, 245, 11 L.Ed. 576 (1845); *cf.* U.S. CONST. art. III, § 2, cl. 2 ("the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make."). Thus, supporting our decision that this case is not prudentially ripe is the congressionally mandated route of review applicable to any action brought to test the constitutionality of the Act.

Appellants' suit seeks a declaration that the Line Item Veto Act is unconstitutional and an injunction against its enforcement. Had the district court ruled on the merits of appellants' claim and granted injunctive relief instead of dismissing it, the decision would likely have been appealed to this court. We would then have been forced to render a decision that might well amount to a constitutionally suspect advisory opinion of questionable authority since it would speak in an area never intended by Congress to be within our jurisdiction.

In other words, not only is this controversy unfit for decision by this court at this time, it may never be ripe for us to decide. Therefore, deciding the controversy would be at best a waste of judicial resources, and at worst a usurpation. Either way, ripeness considerations dictate that we affirm the district court's dismissal of the action.

## III. Conclusion

NTEU may, at some time in the future, suffer an imminent concrete injury that is fairly traceable to the Line Item Veto Act. Because that point has not yet been reached, we hold that NTEU's claim is neither constitutionally nor prudentially justiciable.

ROGERS, Circuit Judge, concurring:

Because I conclude, for the reasons set forth in Part II B of the Court's opinion, that the issue raised by appellants is not ripe, I concur in affirming the dismissal of the complaint.