Jennifer EFRON, a minor, By and Through David EFRON and Madeleine Efron, as her next friends, Plaintiff,

v.

The UNITED STATES of America, Defendant.

No. 96–3706–CIV.

United States District Court, S.D. Florida, Miami Division.

April 7, 1998.

Guy B. Bailey, Jr., Bailey & Jones, Miami, FL, for Plaintiff.

Dexter A. Lee, Asst. U.S. Atty., U.S. Attorneys Office, Miami, FL, for Defendant.

## ORDER

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendant's Motion To Dismiss ("Motion") (DE # 3).

UPON CONSIDERATION of the Motion, responses, and the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

## BACKGROUND

Jennifer Efron ("Efron"), a minor, brings suit by and through David Efron and Madeleine Efron, her parents and next friends, against the United States of America ("United States"). As part of a pleading titled "Complaint by Puerto Rican Citizen for a Determination that Her 'Statutory' Citizenship Is Irrevocable, or To Declare Unlawful the INS's Refusal To Process Her Application Solely Because of Her Prior 'Statutory' Citizenship Status ("Complaint")," Efron seeks declaratory relief against the United States.

Efron, a resident of Dade County, Florida for at least five years, was born in the Commonwealth of Puerto Rico in 1984. Pursuant to 8 U.S.C. § 1402, which provides that all persons born in Puerto Rico on or after January 13, 1941 who are subject to the jurisdiction of the United States are citizens of the United States at birth, Efron was accorded United States citizenship at birth. Efron refers to her United States citizenship as "statutory" because it was ordained by statute. She claims that her citizenship is "revocable" because Congress, under the Territorial Clause of the United States Constitution, Article IV, § 3, has the power to dispose of and make laws respecting the territories of the United States, including Puerto Rico. Efron reasons that because Congress had the power under the Territorial Clause to grant United States citizenship to Puerto Ricans through 8 U.S.C. § 1402, Congress may, in the future, take the position that it has the power to revoke said citizenship.

Efron seeks what she terms "constitutional" or "irrevocable" citizenship, the citizenship accorded to all persons born or naturalized in the United States pursuant to the Fourteenth Amendment of the United States Constitution. According to Efron's Complaint, Efron attempted to obtain what she refers to as "constitutional" or "irrevocable" citizenship by filing an application with the Immigration and Naturalization Service ("INS"). Efron seeks naturalized citizenship because of what she views as the possibility that Congress could revoke or diminish her "statutory" citizenship. The INS allegedly refused to process her application for naturalized citizenship because Efron is already a United States citizen pursuant to 8 U.S.C. § 1402. In Count I of her Complaint, Efron alleges that Congress, through the INS, violated her Fifth Amendment due process rights when it refused to process her application for naturalized citizenship.

Count II of Efron's Complaint sheds some light on the history of this lawsuit. In Count II, Efron reveals that a bill introduced in Congress by United States Representative Don Young ("the Young bill") threatens to revoke or diminish Efron's "statutory" citizenship. In opposing the United States' Motion, Efron elaborates by stating that the Young bill aims to force Puerto Rico to choose statehood or independence sometime during this calendar year. "Should independence be chosen," Efron claims, "the bill mandates that Congress exercise its power— presumably under the Territorial Clause—to revoke U.S. citizenship given to Puerto-Ricans ... under Section 1402." Accordingly, Efron asks the Court to declare her citizenship irrevocable or, in the alternative, to declare that her "statutory" citizenship cannot prevent her from applying for "constitutional citizenship."

## DISCUSSION

The United States moves to dismiss the declaratory relief counts contained in Efron's Complaint. First, the United States claims that the Court lacks subject matter jurisdiction over this action because there is no actual case or controversy, thereby making the case unripe for judicial review. The United States also argues that Efron's Complaint should be dismissed pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a cause of action upon which relief can be granted.

The United States claims that Efron's declaratory relief causes of action should be dismissed pursuant to Rule 12(b)(1), Fed. R.Civ.P., because the Court lacks subject matter jurisdiction over this action. According to the United States, the declaratory relief claims presented in Efron's Complaint are not ripe for judicial review. As a result, the argument continues, there is no actual

case or controversy before the Court, and the Court lacks subject matter jurisdiction to hear the case at this time. For the reasons set forth below, the Court agrees that it does not have subject matter jurisdiction over Efron's claims for declaratory relief.

By the express terms of the United States Constitution, federal courts are confined to adjudicating actual cases and controversies. U.S. Const. art. III, § 2; *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The "case or controversy" requirement defines with respect to the judicial branch the idea of separation of powers on which our government is founded. *Id.* Several "justiciability" doctrines, including mootness, ripeness, standing and political question, have developed in order to give meaning to the Article III case or controversy requirement. *Id.; National Treasury Employees Union v. United States,* 101 F.3d 1423, 1427 (D.C.Cir.1996). "All of the doctrines that cluster about Article III ... relate in part, and in different though overlapping ways, to an idea, which is more than intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Allen,* 468 U.S. at 750, 104 S.Ct. 3315 (quoting *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178–79 (D.C.Cir.1982)).

■ The justiciability doctrine of ripeness is implicated in this case. This doctrine is useful when evaluating cases, such as Efron's, in which injuries have not yet occurred. *Wilderness Society v. Alcock,* 83 F.3d 386, 390 (11th Cir.1996). In essence, the ripeness doctrine exists to prevent a federal court from wasting its resources by prematurely entangling itself in abstract disagreements. *National Treasury Employees Union,* 101 F.3d at 1431. Where, as here, other branches of government are involved, the ripeness doctrine serves to protect the other branches from judicial interference until their decisions are formalized and their effects felt in a concrete way by the challenging party. *Id.* (internal quotations omitted); *see Wilderness Society,* 83 F.3d at 390.

■ In determining whether the facts of a case are ripe for review, a court must evaluate the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *National Treasury Employees Union,* 101 F.3d at 1431; *Wilderness Society,* 83 F.3d at 390. Courts have also acknowledged the existence of an additional, unspoken element of the ripeness doctrine—if we do not need to decide it now, we may never need to. *Id.* As the United States Court of Appeals for the District of Columbia Circuit noted in determining that a challenge to the yet unavailable veto power created by the Line Item Veto Act was not ripe for judicial review, "[n]ot only does this rationale protect the expenditure of judicial resources, but it comports with our theoretical role as the governmental branch of last resort.... Article III courts should not make decisions unless they have to." *Id.*

■ In determining the fitness of the issue for judicial determination, the court must determine whether it is faced with an abstract question or a concrete controversy. *Browning-Ferris Industries of Alabama, Inc. v. Alabama Department of Environmental Management,* 799 F.2d 1473, 1478 (11th Cir.1986). In the declaratory judgment context, the analysis boils down to "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Maryland Casualty Company v. Pacific Coal & Oil Company,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)). In other words, the injury in question must be immediate or imminently threatened and not conjectural, hypothetical or abstract. *National Treasury Employees Union,* 101 F.3d at 1427; *Wilderness Society,* 83 F.3d at 390.

■ The Court finds that the injury claimed by Efron is far too speculative to create a substantial justiciable controversy. At present, there is no controversy, substantial or otherwise, which would merit the Court's consideration of declaratory relief. At least three contingencies not yet met must be satisfied before Efron could possibly

suffer any injury and before a controversy could arise. First, the Young bill would have to clear both houses of Congress and be signed into law—often a feat in and of itself. Second, Puerto Rico would have to hold an election in which independence is chosen over statehood. Finally, Congress would have to decide to revoke the citizenship of those persons made citizens under 8 U.S.C. § 1402. Until those and possibly other contingencies have been met, assuming they are ever met, there is no controversy for the Court to resolve.[1]

To belabor the point for just a moment, the Court notes that Congress, if it does choose to revoke the "statutory" United States citizenship of Puerto Ricans, may nevertheless make provisions for the naturalization of persons, like Efron, who were granted "statutory" United States citizenship at birth but who are now allegedly eligible for naturalization. In fact, an outline of the Young bill's effect if Puerto Rican independence is someday chosen states, "U.S. citizenship is withdrawn and Congress establishes process by which Puerto Ricans can retain U.S. citizenship or become naturalized." *See* Exhibit "A" to Plaintiff's Response to Defendant's Motion To Dismiss. Moreover, the bar to naturalization which Efron claims has arisen as a result of her "statutory" citizenship may no longer be a concern if her "statutory" citizenship is revoked. The Court reviews these possibilities not because it seeks to render advice to Congress, but because it wants to flesh out how uncertain and conjectural the nature of the injury is which the Court is asked to alleviate.

Efron's opposition papers make clear that Efron is seeking redress for an abstract injury that may never materialize. For example, Efron claims that the issue in this case will "almost certainly" arise in 1998. Efron goes on to state that it is "highly likely" that Puerto Rico's status will change within a year because Puerto Rico "may well choose independence." Not to be overlooked is Efron's statement that "should that happen," Congress would repeal her citizenship.[2] As the Eleventh Circuit has noted, the fact that an injury is "more likely" does not make the injury imminent enough for purposes of judicial decisionmaking. *Wilderness Society*, 83 F.3d at 390. The same holds true for an injury that is "highly likely" or one that will "almost certainly" arise because a certain group "may well choose" to follow a certain course.

Turning to the second factor which the Court must address in determining ripeness, the hardship which Efron would suffer if the Court withholds adjudication, the Court concludes that there is no present hardship to Efron. Efron argues that the resulting hardship would be the potential loss of her citizenship. The key word being "potential." In fact, Efron claims that the Court's decision to withhold adjudication "could almost certainly impose upon Ms. Efron a hardship." Efron must speak of her hardship in conditional terms because, in reality, there is no present hardship to Efron. In the absence of a decision by the Court, Efron would still retain her citizenship pursuant to 8 U.S.C. § 1402. The only conceivable hardship to Efron would be the present uncertainty about her future citizenship status. Such uncertainty, however, does not come close to warranting intervention by the Court.

Having reviewed the factors for ripeness and aware of the unspoken rationale behind the ripeness doctrine—if you do not decide it now, you may never have to, the Court concludes that Efron's causes of action for declaratory relief are not ripe for adjudication at this time. Moreover, the Court has no

---

1. Notably, Efron has not provided the Court with any authority to support the proposition that a bill pending in Congress, which one day may find its way into the United States Code, creates an actual case or controversy ripe for adjudication by a federal court. The *Browning–Ferris* case upon which Efron relies involved legislation that had already been enacted by the State of Alabama. *Browning–Ferris*, 799 F.2d at 1474. Moreover, the Eleventh Circuit, at the outset of its opinion, noted that its finding was made "in

view of the particular facts 'presented" to the court. *Id.*

2. Incidentally, a newspaper article which Efron attaches as Exhibit "A" to her opposition papers indicates that the transition would take place in approximately 10 years. *See* Exhibit "A" to Efron's Response to Defendant's Motion To Dismiss.

**1472**

intention of meddling into the legislative branch and upsetting the revered separation of powers on which our government was established.[3]

## CONCLUSION

Based on the foregoing, it is ORDERED AND ADJUDGED that the Motion be, and the same is hereby, GRANTED. Efron's claims for declaratory relief are DISMISSED for lack of subject matter jurisdiction. The United States is directed to respond to Count I of Efron's Complaint within twenty (20) days from the date of this Order.

**3.** Having determined that it lacks subject matter jurisdiction over Efron's claims for declaratory relief, the Court need not address the Rule 12(b)(6) arguments regarding those claims.