**Commonwealth of VIRGINIA, Plaintiff,**

**v.**

**Janet RENO, et al., Defendants.**

**No. Civ.A. 00–00751.**

United States District Court, District of Columbia.

Oct. 17, 2000.

Joseph D. Rich, Robert A. Kengle, Stephen B. Pershing, Brian F. Heffernan, Voting Section, Civil Rights Division, United States Department of Justice, Washington, DC, for United States.

Paul M. Smith, Donald B. Verrilli, Jr., Jenner & Block, Washington, DC, for Marsh Intervenors.

Edward Still, Voting Rights Project, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for Virginia NAACP Intervenors.

Todd A. Cox, NAACP Legal Defense and Educational Fund, Inc., Washington, DC, for Smith Intervenors.

Brian S. Currey, O'Melveny & Myers, L.L.P., Los Angeles, CA, Karen M. Wahle, O'Melveny & Myers, L.L.P., Washington, DC.

## MEMORANDUM OPINION

HENRY H. KENNEDY, Jr., ELLEN S. HUVELLE, District Judges, and ELLEN S. HUVELLE, Circuit Judge.

This is an action for declaratory judgment brought by the Commonwealth of Virginia under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1994) ("Section 5").[1] *See also* 28 U.S.C. §§ 2201, 2284 (1994). Virginia seeks a declaratory judgment concerning recent revisions to the Virginia Election Code, enacted as 2000 Va.Acts ch. 884 ("Chapter 884"). Chapter 884 directs the legislature to use unadjusted population counts provided by the Bureau of the Census when redrawing congressional, state Senate, and state House of Delegates districts. *See* Va.Code Ann. § 24.2–301.1 (2000). In addition, Chapter 884 mandates the use of unadjusted figures when reapportioning representation in the governing bodies of Virginia's counties, cities, and towns. *See* Va.Code Ann. § 24.2–304.1 (2000). Finally, Chapter 884 provides additional time

Frank M. Ferguson, Gregory E. Lucyk, A. Ann Berkebile, Office of Attorney General of Virginia, Richmond, VA, for Commonwealth of Virginia.

---

1. The three-judge court was convened pursuant to 28 U.S.C. § 2284 by orders of July 19 and 24, 2000.

for Virginia's localities to create or modify precincts, following the Census Bureau's release of census data. *See* Va.Code Ann. § 24.2–309.1 (2000).

Virginia presents three major claims in its Amended Complaint of May 18, 2000. First, Virginia argues that Chapter 884 does not require Section 5 preclearance because (1) the Census Act, 13 U.S.C. § 195 (1990), and the United States Constitution require the use of unadjusted figures and (2) Virginia's "continued" use of unadjusted figures does not constitute a "change" in redistricting practices within the meaning of Section 5. Amended Complaint ¶¶ 17–20. Second, Virginia claims that, even if preclearance is required, Chapter 884 was not implemented with the purpose—nor would it have the effect—of "retrogression." *Id.* ¶¶ 24–29. Finally, Virginia challenges the decision of Attorney General Reno to use adjusted figures in Department of Justice preclearance evaluations as being in violation of the Census Act and the Constitution. *Id.* ¶¶ 21–22.

On June 19, 2000, the United States filed a motion to dismiss the Amended Complaint without prejudice, under Fed. R.Civ.P. 12(b)(1), or to stay the proceedings, on the ground that Virginia's claims are not yet ripe. *See Memorandum in Support of Defendant's Motion to Dismiss or Stay Proceedings* ("*Motion to Dismiss*"). On June 30, 2000, Virginia filed an opposition to the United States' motion and a motion for summary judgment, which the United States opposed. *See Memorandum Opposing Defendants' Motion to Dismiss or Stay and in Support of Plaintiff's Motion for Summary Judgment* ("*Opposition to Motion to Dismiss*"); *Reply Memorandum in Support of United States' Motion to Dismiss or Stay Proceedings* ("*Reply Memorandum*"). The court heard argument on the United States' motion to dismiss on September 21, 2000.

Upon review of the pleadings and arguments of counsel, the court grants the United States' motion to dismiss as to counts I, II, III, and IV of the Amended Complaint. As to count V, because the United States does not oppose preclearance of Va.Code § 24.2–309.1, we grant judgment to Virginia.

## I.

Article I, Section 2, Clause 3 of the United States Constitution requires a decennial census of the population. Data from this census are used to calculate state population totals for congressional apportionment. *See* U.S. Const. art. I, § 2, cl. 3. To this end, the Census Act requires the Secretary of Commerce to report state population totals from Census 2000 to the President within nine months of the census date, i.e., by January 1, 2001. *See* 13 U.S.C. § 141(b) (1990). In addition to this constitutional purpose, the data from Census 2000 are used by states (including the Commonwealth of Virginia) to draw boundaries for state and local legislative bodies. *See Opposition to Motion to Dismiss* at 4–5. The Census Act requires the Census Bureau in the Commerce Department to report this block-level data for use in state redistricting directly to the states "within one year after the decennial census date," i.e., by April 1, 2001. 13 U.S.C. § 141(c) (1990).

Studies by the Census Bureau demonstrate that each census has produced a net undercount of the population and shown a higher "differential undercount" for ethnic and racial minorities and children. *See* U.S. Department of Commerce, Bureau of the Census, Accuracy and Coverage Evaluation: Statement on the Feasibility of Using Statistical Methods to Improve the Accuracy of Census 2000 (2000) at 4–7 ("Feasibility Statement"). To increase the accuracy of the census, the Census Bureau has developed a series of statistical methods that correct for these differential undercounts and generate "adjusted" census figures. The Census Bureau's "adjustment" practice, however, has prompted debate and criticism, resulting in several lim-

itations on the Census Bureau's authority to release statistically adjusted figures for the 2000 Census. First, Congress has directed that, if the Census Bureau releases adjusted figures in satisfaction of its § 141 obligations, it must also release a companion set of block-level, unadjusted population data. *See* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub.L. No. 105–119, § 209(j), 111 Stat. 2440, 2483 (1997). Second, in *Department of Commerce v. United States House of Representatives,* 525 U.S. 316, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999), the Supreme Court recently held that the Census Act prohibits the use of adjusted data for constitutionally-mandated congressional apportionment. *Id.* at 343, 119 S.Ct. 765.

Following the decision in *Department of Commerce,* the Census Bureau announced that it has not yet determined whether to release adjusted data for purposes of state redistricting under § 141(c).[2] *See* Feasibility Statement at 52. The Census Bureau intends to conduct an Accuracy Coverage Evaluation ("A.C.E."), which "is designed to correct for missed individuals or erroneous enumerations in the traditional enumeration." *Id.* at 1. After the A.C.E. is completed, the Census Bureau will conduct a thorough review of its quality and methodology. *See id.* at 52. In testimony before Congress in May 2000, the Director of the Census Bureau stated that while the Bureau "currently expects that the corrected numbers using [sampling] will be the more accurate numbers," it will not release adjusted data if it "does not have confidence in the [sampled] results." Prepared Testimony of Kenneth Prewitt, Director, U.S. Bureau of the Census, Before the Subcommittee on the Census, Committee on Government

Reform, U.S. House of Representatives (May 19, 2000), *available at* 2000 WL 668026.

In the 2000 Session of the Virginia General Assembly, Virginia enacted Chapter 884. Chapter 884 amends § 24.2–304.1 to state in pertinent part:

> § 24.2–304.1. At–large and district elections; reapportionment of districts or wards; limits.
>
> \*    \*    \*    \*    \*    \*
>
> C. For the purposes of reapportioning representation in 2001 and every ten years thereafter, the governing body of a county, city, or town shall use the most recent decennial population figures ... from the United States Bureau of the Census, which figures are identical to those from the actual enumeration conducted by the United States Bureau of the Census for the apportionment of representatives in the United States House of Representatives....

In addition, Chapter 884 adds the following provision to the Virginia Election Code:

> § 24.2–301.1. Reapportionment of congressional and state legislative districts; United States Census population counts. For the purposes of redrawing the boundaries of the congressional, state Senate, and House of Delegates districts ... the General Assembly shall use the population data provided by the ... Bureau of the Census identical to those from the actual enumeration conducted by the Bureau for the apportionment of the Representatives of the United States House of Representatives....

Finally, Chapter 884 amends § 24.2–309.1 to grant localities additional time to change and/or create voting precincts.[3]

---

**2.** In its Motion to Dismiss, the United States notes that, on June 13, 2000, the Department of Commerce proposed a regulation providing in part that the "Director of the Census shall make the final determination regarding the methodology to be used in calculating the tabulations of population reported to States and localities pursuant to 13 U.S.C. § 141(c)." *Motion to Dismiss* at 9–10.

**3.** Specifically, Va.Code § 24.2–309.1, as amended, provides in relevant part:

No county, city, or town shall create, divide, abolish, or consolidate any precincts,

Virginia is a jurisdiction covered by the preclearance requirements of Section 5 of the Voting Rights Act. As such, it is prohibited from enacting any change in "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," without obtaining either judicial preclearance from the United States District Court for the District of Columbia or administrative preclearance from the Attorney General. *See* 42 U.S.C. §§ 1973c, 1973b(a), (b).

## II.

Virginia seeks a declaratory judgment on five counts. Count I claims that Virginia is not required to obtain Section 5 preclearance concerning Chapter 884 because (1) the Census Act and the United States Constitution require Virginia to use unadjusted data and (2) Virginia's "continued" use of unadjusted figures does not constitute a "change" within the meaning of Section 5. Amended Complaint ¶¶ 17–18, 20. Count II alleges that the Attorney General's plan to use adjusted figures when evaluating redistricting submissions under Section 5 violates the Census Act and is unconstitutional.[4] *Id.* ¶¶ 21–22. Counts III and IV allege that Virginia did not enact Chapter 884 with a retrogressive purpose, nor will the statutes have a retrogressive effect within the meaning of Section 5. *Id.* ¶¶ 24–29. Count V alleges that Va.Code § 24.2–309.1, extending the time for localities to draw voting precincts, does

not have a retrogressive purpose or effect within the meaning of Section 5. *Id.* ¶¶ 32–35.

■ In support of its motion to dismiss the complaint as unripe, the United States argues that "Virginia's essential goal—to prevent statistically adjusted 2000 Census population data from being used for state redistricting—will be meaningful only if statistically adjusted data are released by the Census Bureau." *Motion to Dismiss* at 13. Because the Census Bureau has not yet decided to release adjusted data, Virginia's dispute relies on a contingent future event, not an established fact. Further, "assuming [that] adjusted data are released, the effect of preventing [the] use of those data cannot now be known." *Id.* at 14. It follows, in the view of the United States, that "the central factual premise of Virginia's case for preclearance of Chapter 884—that the ban on the use of statistically adjusted census data for redistricting will not have a retrogressive effect under Section 5—necessarily is speculative...." *Id.* Regarding count II, the United States argues, alternatively, that Virginia's attempt to challenge the Attorney General's decision to use adjusted data, if available, in Section 5 preclearances is nonjusticable. *See id.* at 37. As to count V, the United States does not oppose the preclearance of § 24.2–309.1. *See id.* at 2 n. 3 & 15 n. 12.

In opposing the dismissal of its amended complaint, Virginia argues that count I presents pure questions of law: (1) wheth-

---

or otherwise change the boundaries of any precinct, effective during the period from September 1, 1998, to May 15, 2001.... The prior version of the statute prohibited localities from redrawing precinct boundaries from September 1, 1998 until June 1, 2001. *See Opposition to Motion to Dismiss* at 9.

4. As evidence that the Department of Justice plans to use adjusted data in its preclearance review, Virginia submits a March 24, 1990 letter to the Governor and Attorney General of Arizona from the Acting Chief of the Department of Justice's Voting Section stating in pertinent part that:

it is the consistent practice of [the Department of Justice] in evaluating submissions

under Section 5 ... to analyze redistricting plans using the data designated by the Bureau of the Census for redistricting pursuant to PL 94–171.... Thus, the Attorney General's review and assessment of any redistricting plan under Section 5 will not be restricted by [a state's] redistricting process.

*Opposition to Motion to Dismiss,* Exhibit 8 at Exhibit C. *See Opposition to Motion to Dismiss* at 12. In this letter, however, the Department of Justice also stated that it "consider[s] other demographic and election data in these analyses." *Opposition to Motion to Dismiss,* Exhibit 8 at Exhibit C. ·

er Chapter 884 amounts to a "change" in Virginia law that requires preclearance under Section 5, and (2) whether the Constitution and the Census Act mandate the use of actual census figures. *See Opposition to Motion to Dismiss* at 3. Further, relying on its past practice of using the actual enumeration, Virginia argues that the relief sought for counts III and IV is not dependent on the type of data that the Census Bureau releases for the 2000 Census. Virginia claims that the court need only determine whether the enumeration requirements of Chapter 884 are retrogressive in purpose or effect. To make this determination, Virginia argues, the court need only refer to the actual enumeration provided by the Census Bureau in the past, as required by *Reno v. Bossier Parish School Board,* 528 U.S. 320, 120 S.Ct. 866, 875, 145 L.Ed.2d 845 (2000). *See Opposition to Motion to Dismiss* at 3, 18, 41. Moreover, Virginia references the Census Bureau's stated plans as evidence that "it is a virtual certainty that the Bureau's official, 2001 PL 94–171 Redistricting data will be adjusted through the use of statistical sampling." *Opposition to Motion to Dismiss* at 6. In support of this assertion, Virginia refers to a March 1, 2000 letter to the Speaker of the Virginia House of Delegates from the Chief of the Census 2000 Data Office. This letter, Virginia claims, makes clear that the discretionary decisions regarding whether to engage in statistical sampling have been made and only operational questions remain. *See id.* at 13. Finally, Virginia claims that by not receiving the census data before April 1, 2001, its ability promptly to redistrict is impeded because it will receive the data "significantly later" than it has in the past. *Id.* at 6.

### A.

As a threshold matter, the court must address the jurisdictional question of ripeness. *See Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). *See also Texas v. United States,* 523 U.S. 296, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998); *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). As the Supreme Court has stated, the ripeness doctrine "is drawn from both Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Catholic Soc. Servs.,* 509 U.S. at 57 n. 18, 113 S.Ct. 2485. Article III confines federal courts to adjudicating "actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). *See also Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 579, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985). Moreover, "prudential" ripeness reflects the "court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Grand Canyon Air Tour Coalition v. Fed. Aviation Admin.,* 154 F.3d 455, 472 (D.C.Cir.1998) (*quoting Florida Power & Light Co. v. EPA,* 145 F.3d 1414, 1421 (D.C.Cir.1998)). In evaluating the "prudential" ripeness of a claim, a court must consider "the fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). To determine whether a claim is fit for judicial decision, a court evaluates "whether the issue is '(a) essentially legal, and (b) sufficiently final.'" *Consol. Rail Corp. v. United States,* 896 F.2d 574, 577 (D.C.Cir.1990) (citation omitted). *See also Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 163–64, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967). To satisfy the "hardship" prong of *Abbott Laboratories,* a court must look to the "degree and nature of the regulation's present effect on those seeking relief," *Toilet Goods,* 387 U.S. at 164, 87 S.Ct. 1520, and conclude that "the impact of the regulation[ ] upon the petitioners is sufficiently direct and immediate as to render the issue appropriate for judicial review at this time." *Abbott Labs.,* 387 U.S. at 152, 87 S.Ct. 1507.

Assuming that Chapter 884 is subject to preclearance under Section 5, Virginia must demonstrate that the statutes "[do] not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color...." 42 U.S.C. § 1973c. Virginia would have the burden of persuasion on both points. *See Bossier Parish Sch. Bd.,* 120 S.Ct. at 871–72. As to counts III and IV, Virginia argues that if Section 5 applies, Chapter 884 satisfies this standard. *See Opposition to Motion to Dismiss* at 41–44.

Even were it possible for the court to arrive at a factual determination of the "purpose" of Chapter 884, the statutes' "effect" could depend on contextual factors that are not yet certain. To evaluate Virginia's legislation under Section 5, the court would have to decide if the difference between actual and adjusted figures is of significance, and whether redistricting using actual figures could be considered a "retrogression in the position of racial minorities with respect to [voting]." *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). *See also Bossier Parish Sch. Bd.,* 120 S.Ct. at 872. This analysis need only be conducted if and when the Census Bureau releases adjusted figures. If the Census Bureau does not release adjusted data, Chapter 884 will have no practical effect, and this court would not need to grapple with the issue of whether to define retrogression in terms of adjusted figures.

Although the Census Bureau has announced that it plans to release adjusted figures, it has not yet committed to doing so. Rather, the Census Bureau has stated that it will make its final decision on whether to release adjusted data after it evaluates the quality and accuracy of the A.C.E. process. *See* Feasibility Statement at 52–54. This situation is markedly different from *Department of Commerce,* where there was a final decision by the Census Bureau to use sampling in conducting the enumeration for congressional apportionment. *See Dep't of Commerce,* 525 U.S. at 320, 119 S.Ct. 765; *United States House of Representatives v. Dep't of Commerce,* 11 F.Supp.2d 76 (D.D.C.1998). By contrast, the circumstances that Virginia presents in counts III and IV are a textbook example of a claim that is not ripe for adjudication. Notwithstanding Virginia's insistence that the release of adjusted figures is a virtual certainty, this argument relies upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas,* 473 U.S. at 580–81, 105 S.Ct. 3325 (*quoting* 13A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3532 (1984)). Hence, absent the existence and release of adjusted population figures, Virginia's claims fail to satisfy Article III and the fitness prong of *Abbott Laboratories.*

■ Furthermore, Virginia has not satisfied the "hardship" prong of the *Abbott Laboratories* ripeness inquiry. In evaluating whether a claimant has asserted adequate "hardship," a court must evaluate whether " 'the interests of the court and agency in postponing review until the question arises in some more concrete and final form [are] outweighed by the interest of those who seek relief from the challenged action's immediate and practical impact upon them.' " *Aulenback, Inc. v. Fed. Highway Admin.,* 103 F.3d 156, 166–67 (D.C.Cir.1996) (*quoting Continental Air Lines, Inc. v. Civil Aeronautics Bd.,* 522 F.2d 107, 125 (D.C.Cir.1974) (en banc)). Virginia argues that "withholding judicial review would impose irreparable hardship on the people" of Virginia, because the state is operating under a "compressed schedule" in preparation for the 2001 elections. *Opposition to Motion to Dismiss* at 1–2. In support of its hardship claim, Virginia relies on the June 27, 2000 affidavit of Cameron Quinn, the Secretary of the State Board of Elections for Virginia. In his affidavit, Mr. Quinn states that if the court delays a determination of the enforceability of Chapter 884 until the Spring of 2001, "it will be virtually impossible for

timely elections to proceed in Virginia in November of 2001." *Opposition to Motion to Dismiss*, Exhibit 1 at 3.

Yet, as the United States points out, Virginia has recently enacted a statute that allows the State Board of Elections to reschedule primaries "if it appears that the necessary 2001 reapportionment or redistricting will not be completed, and preclearance from the appropriate United States authority under Section 5 ... will not be received in time...." 2000 Va. Acts ch. 886 (2000). *See Reply Memorandum* at 5–6. Moreover, the United States argues, there is nothing to prevent Virginia from redistricting on the basis of actual figures, as it claims it has consistently done in the past. *See Motion to Dismiss* at 25; *Opposition to Motion to Dismiss* at 18. If Virginia is correct that Chapter 884 does not trigger Section 5 preclearance, or, alternatively, that Chapter 884 merits preclearance, then the future release of adjusted figures will not affect Virginia's redistricting plan. In addition, the Census Bureau and the Department of Justice have announced their intention to expedite proceedings for states that must meet redistricting deadlines. The Census Bureau has stated that it "will, as in the past, release the numbers from Census 2000 to the states as they are ready, giving priority to states that need to meet early deadlines." Feasibility Statement at 14. At the September 21st hearing, the Department of Justice stated that it plans to expedite Section 5 review for Virginia and other states holding elections in 2001.

### B.

▮▮▮ Virginia also presents several constitutional and statutory claims that purport to be independent from the substance of the preclearance dispute. Count I alleges that Chapter 884 is not subject to Section 5 preclearance because (1) the Census Act and the United States Constitution require the use of actual figures, and (2) Virginia's "continued" use of actual figures does not constitute a "change"

within the meaning of Section 5. Count II alleges that the Attorney General's plan to use adjusted figures in preclearance evaluations is unconstitutional and violates the Census Act. Neither of these claims, however, is ripe.

Virginia argues that count I presents pure questions of statutory and constitutional interpretation that are not contingent on the Census Bureau's release of adjusted data. *See Opposition to Motion to Dismiss* at 2–3. Moreover, Virginia contended at the hearing that the court must determine at this time the substantive issue of Section 5 coverage, because absent Section 5 applicability, the court lacks jurisdiction.

While Virginia is correct that count I presents questions of law, the relevance of these claims—and the ultimate need for their adjudication—depends entirely on the Census Bureau's release of adjusted population data. Until the Census Bureau decides which census figures to release, a judicial ruling on these questions of law would respond to an "abstract disagreement[ ]" that may never materialize. *Abbott Labs.*, 387 U.S. at 148, 87 S.Ct. 1507. Indeed, if the Census Bureau releases only actual figures, there may well be no dispute between the parties regarding Chapter 884, and any ruling by the court now on the issues raised by count I would become an advisory opinion prohibited under Article III. *Lewis*, 494 U.S. at 477, 110 S.Ct. 1249. For these reasons, ripeness considerations preclude our review of count I at this time.

Having concluded that count I is not ripe for judicial consideration, the court need not reach the substance of Virginia's Section 5 coverage claim. Once a court determines that a claim is unripe, it has satisfied its obligation to make a threshold determination concerning jurisdiction. *See Catholic Soc. Servs.*, 509 U.S. at 57–58, 113 S.Ct. 2485 (1993). In *Texas*, for example, the Supreme Court upheld a district court's dismissal of similar claims of Section 5 inapplicability on the ground that

**54**

the dispute was not ripe for adjudication. *See Texas,* 523 U.S. at 299–302, 118 S.Ct. 1257. Similarly, in *Ohio Forestry Association v. Sierra Club,* 523 U.S. 726, 732, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998), the Supreme Court ordered the dismissal of claims on the ground that they did not satisfy the threshold requirement of ripeness and therefore were not justiciable. In other words, the court abides by the "usually unspoken element of the rationale underlying the ripeness doctrine: If we do not decide it now, we may never need to .... Article III courts should not make decisions unless they have to." *Nat'l Treasury Employees Union v. United States,* 101 F.3d 1423, 1431 (D.C.Cir.1996).

As is true for counts I, III, and IV, count II is also not ripe. Its existence and significance depend solely upon the Census Bureau's release of adjusted figures; this contingent future event does not point to an actual, justiciable controversy. Because count II fails to satisfy the ripeness requirement, we do not reach the United States' alternative argument, citing *Morris v. Gressette,* 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977), that count II is nonjusticiable. *See Motion to Dismiss* at 35–37 & n. 33.

■ Accordingly, we hold that counts I, II, III, and IV are not ripe for review by the court at this time. Until the Census Bureau releases adjusted figures, the court need not consider Virginia's claims, for ripeness considerations preclude the court from deciding either the legal issues in counts I and II or the factual claims in counts III and IV. We therefore grant the United States' Rule 12(b)(1) motion and dismiss, without prejudice, counts I, II, III, and IV, and, in the absence of objection by the United States, we grant judgment for Virginia on count V.