**AMERICAN FARM BUREAU, et. al., Plaintiffs,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et. al., Defendants.**

**No. CIV. 99–01405 ESH.**

United States District Court, District of Columbia.

Oct. 30, 2000.

Kenneth W. Weinstein, Jeffrey R. Holmstead, Latham & Watkins, Washington, DC, Edward S. Lee, Peter C. Choharis, Mayer, Brown & Platt, New York, NY, John Joseph Sullivan, Mayer, Brown & Platt, Washington, DC, for Plaintiffs.

Brian H. Lynk, U.S. Department of Justice, Environmental Defense Section, Washington, DC, for Defendants.

Erik D. Olson, Natural Resources Defense Council, Washington, DC, for Intervenor–Defendant Natural Resources Defense Council.

### MEMORANDUM OPINION

HUVELLE, District Judge.

This case comes before the court on a motion to dismiss the fourth amended complaint filed by defendant United States Environmental Protection Agency (EPA) and on motions to dismiss counts one through nine and/or to sever and transfer

counts eight and nine filed by intervener defendant Natural Resources Defense Council (NRDC). In addition, defendant EPA has moved for a protective order. Plaintiffs seek declaratory and injunctive relief to compel the EPA to take certain actions that plaintiffs claim are statutorily mandated, including the promulgation of regulations and guidelines and the implementation of procedures to collect scientific data for the evaluation of pesticide safety, and to preclude the EPA from applying other policies which plaintiffs allege are unlawful.

## BACKGROUND

Plaintiffs, twenty-five organizations representing farmers and other producers of food crops, manufacturers and suppliers of crop protection and enhancement products, and manufacturers and users of pesticides and other chemicals, challenge the EPA's implementation of the Food Quality Protection Act of 1996 (FQPA), Pub.L. No. 104–170. The FQPA amended both the Federal Food, Drug, and Cosmetic Act (FFDCA), 21 U.S.C. §§ 301–394, and the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136–136y, by requiring the EPA to evaluate new pesticide uses and reevaluate the safety of authorized pesticide uses based upon a complex measurement of risk factors. FFDCA § 408(b)(2)(A)(ii), 21 U.S.C. § 346a(b)(2)(A)(ii).

The EPA regulates pesticides under both the FFDCA and FIFRA. FIFRA imposes a federal licensing scheme on the sale, distribution, and use of pesticides. It provides that "no person in any State may distribute or sell to any person any pesticide that is not registered" by the EPA. 7 U.S.C. § 136a(a). A pesticide cannot be registered unless EPA, after substantial testing, determines that "it will not generally cause unreasonable adverse effects in the environment." 7 U.S.C. § 136a(c)(5)(D). The process for registering a pesticide is described in FIFRA and EPA regulations at 7 U.S.C. § 136a and 40

C.F.R. §§ 152 and 158. Under certain "emergency" conditions, however, the EPA may exempt a pesticide use from the FIFRA registration requirement. 7 U.S.C. § 136p. FIFRA further provides that if the EPA later determines that additional scientific data are required to maintain in effect an existing pesticide registration, the EPA must notify all registrants of the pesticide in what is termed a "data call-in" to provide registrants with the opportunity to submit the additional data specified in the notice or face suspension of their registration. 7 U.S.C. § 136a(c)(2)(B)(ii). Under 1988 amendments to FIFRA, the EPA is required to re-register any pesticide first registered before November 1, 1984. 7 U.S.C. § 136a–1(a)–(g). For those pesticides that the EPA re-registers, EPA must determine whether additional "product-specific data" is needed, and if so, obtain that information through a data call-in. 7 U.S.C. § 136a(g)(2)(A) and (B). Upon review of the product-specific data, the EPA must decide if the particular product warrants re-registration. 7 U.S.C. § 136a–1(g)(2)(C).

The FFDCA provides for the regulation of the presence of pesticides in agricultural commodities by empowering the EPA to establish "tolerances" setting the maximum allowable levels of pesticide residue in foods. 21 U.S.C. § 346a(b)(1). Before any agricultural commodity containing pesticide residue can be sold or distributed, a tolerance that meets statutory safety standards must be adopted by the EPA for that pesticide. Where a pesticide is used on more than one food crop, a separate tolerance for the pesticide must be established for each crop. Foods containing pesticide residues for which no tolerance has been set or containing a pesticide residue level greater than the tolerance established by the EPA are considered "unsafe" and "adulterated" and may not legally be moved in interstate commerce. 21 U.S.C. §§ 331(a), 342(a)(2)(B), 346a(a). However, the EPA may establish an exemption from the tolerance for a pesticide

chemical residue in or on food if the agency determines that it is safe, *i.e.*, that "there is a reasonable certainty that no harm will result from aggregate exposure to the pesticide chemical residue, including all anticipated dietary exposure and all other exposure for which there is reliable information." 21 U.S.C. §§ 346a(c)(1)-(2). Tolerances and exemptions are established, modified, and revoked both upon the EPA's own initiative and in response to petitions from the public, as described at 21 U.S.C. § 346a(d)(2) and 40 C.F.R. § 180.7. If, after a tolerance is established, the EPA "determines that additional data or information are reasonably required to support the continuation of a tolerance or exemption ... the [agency] shall—(A) issue notice requiring the person holding the pesticide registrations associated with such tolerance or exemption to submit the data or information under section 3(c)(2)(B) of [FIFRA] ...; (B) issue a rule requiring that testing be conducted on a substance or mixture under section 4 of the Toxic Substances Control Act ...; or (C) publish in the Federal Register, after first providing notice and an opportunity for comment of not less than 60 days duration, an order" announcing a data call-in and specifying the type of information that must be submitted to the agency. 21 U.S.C. § 346a(f)(1).

The FQPA significantly amended both FIFRA and the FFDCA by increasing the number of factors that the EPA must consider in establishing a tolerance or exemption, including "aggregate exposure to the pesticide chemical residue" from "all anticipated dietary exposures and all other exposures for which there is reliable information" and the cumulative effects of substances that have a "common mechanism of toxicity." 21 U.S.C. § 346a(b)(2)(A)(ii). Furthermore, EPA must use "an additional tenfold margin of safety" when applying the standard to children and infants. 21 U.S.C. § 346a(b)(2)(C)(ii)(II). The FQPA amendments also require the EPA to reassess the more than 9,000 pesticide

tolerances and exemptions in existence at the time the amendments were enacted to determine whether those tolerances meet the more stringent FQPA safety standards. 21 U.S.C. § 346a(q). The FFDCA, as amended, provides the following three-tiered schedule for the reassessment of existing tolerances and exemptions: (1) 33% within three years of August 3, 1996, (2) 66% within six years of August 3, 1996, and (3) 100% within ten years of August 3, 1996. 21 U.S.C. § 346a(q)(1). EPA is to give priority in the reassessment process to those tolerances and exemptions that "appear to pose the greatest risk to public health." 21 U.S.C. § 346a(q)(2). These reassessments are conducted in conjunction with EPA's existing obligation under FIFRA to re-register all pesticides registered before November 1, 1984. The FFDCA, as amended, also requires the EPA to issue tolerances for pesticide uses exempted under the § 18 emergency provision of FIFRA. 21 U.S.C. § 1346a($l$)(6), 7 U.S.C. § 136p. EPA is directed to promulgate regulations governing the establishment of tolerances for § 18 exemptions within 365 days of the enactment of the FQPA. *Id.* Finally, the FQPA amendments called for the EPA to implement an endocrine disruptor screening program within three years after August 3, 1996, to determine "whether certain substances may have an effect in humans that is similar to an effect produced by a naturally occurring estrogen, or such other endocrine effect as [EPA] may designate." 21 U.S.C. § 346a(p)(1).

Plaintiffs filed suit on June 2, 1999, and have since amended the complaint four times. The Fourth Amended Complaint alleges that (1) EPA has failed to promulgate regulations setting tolerances for emergency exemptions under FIFRA § 18, in violation of its statutory duty under § 408(1)(6) of the FFDCA; (2) EPA has failed to promulgate data requirements for the establishment and continuation of tolerances, as required under the

FFDCA § 408(d)(2)(A); (3) EPA has failed to update the data requirements for registration of a pesticide, as required under FIFRA § 3(c)(2)(A); (4) EPA has failed to implement the FFDCA § 408(f)(1) by not collecting the data needed to complete tolerance reassessments; (5) EPA has failed to comply with the data collection requirements of FIFRA § 3(c)(2)(A) and § 3(c)(2)(B); (6) EPA has adopted a policy using the 99.9th percentile of acute dietary exposure as the regulatory threshold for determining whether a tolerance satisfies statutory safety standards in a manner that has the force and effect of law, without following the rule-making requirements of § 553(b) of the Administrative Procedures Act (APA); (7) EPA has implemented an FQPA infant and child safety factor policy in a manner that has a binding and future effect for the regulated industry, without following the rule-making requirements of APA § 553(b); (8) EPA has not met its published three-part tolerance reassessment schedule under the FFDCA § 408(q)(3); (9) EPA has failed to develop and implement an estrogenic substances screening program pursuant to the FFDCA § 408(p); and (10) EPA has failed to provide adequate notice and opportunity to comment on the cancellation order for methyl parathion as required by FIFRA § 6(f)(1)(B).

In response, defendant EPA moved to dismiss the fourth amended complaint in its entirety on the grounds that (1) counts 2–5 fail to identify a statutory duty that has been "unlawfully withheld" or "unreasonably delayed" within the meaning of the APA, 5 U.S.C. § 706(1); (2) counts 2–7 fail to meet the APA requirement of a "final agency action;" (3) counts 2–7 are not ripe; (4) plaintiffs have failed to exhaust administrative remedies with respect to counts 2–7; (5) plaintiffs lack standing to pursue counts 8 and 9; (6) count 10 is not ripe or fails to identify a case or controversy; and

(7) this court lacks jurisdiction to hear counts 1, 2, 6, and 7, which belong in the Court of Appeals. NRDC filed a motion to intervene as a defendant in this case on October 27, 1999, which the court granted on February 7, 2000. NRDC has not moved to dismiss the fourth amended complaint in its entirety, but has only moved to dismiss counts 1–9. NRDC asserts that this court lacks jurisdiction to hear counts 1, 2, 6, and 7 because the Court of Appeals has exclusive jurisdiction over these counts.[1] NRDC further moves to dismiss counts 2–7 as not yet ripe for review and to dismiss counts 8 and 9 for lack of standing. In a separate motion, NRDC asks the court to sever and transfer counts 8 and 9 to the Ninth Circuit Court of Appeals or to the U.S. District Court for the Northern District of California.

## ANALYSIS

In deciding a motion to dismiss, the court "must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiffs." *Fitts v. Federal Nat'l Mortgage Ass'n*, 44 F.Supp.2d 317, 321 (D.D.C.1999). However, the court need not accept plaintiffs' legal conclusions as true. *See Artis v. Greenspan*, 158 F.3d 1301, 1306 (D.C.Cir. 1998). The court cannot address any issue if it lacks subject matter jurisdiction, and the case must be dismissed under Fed. R.Civ.P. 12(b)(1). *Fitts*, 44 F.Supp.2d at 320. Plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence. If the court determines that "no relief could be granted under any set of facts that could be proved consistent with [plaintiffs'] allegations," the case must be dismissed under Fed. R.Civ.P. 12(b)(6) for failure to state a claim. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

1. NRDC also asks the court to determine whether it has jurisdiction over counts 3–5 and 8–9. EPA has not moved to dismiss these counts for lack of jurisdiction.

## I. JURISDICTION UNDER "TRAC": COUNTS 1, 2, 6, AND 7

Defendants argue that this court lacks jurisdiction to hear counts 1, 2, 6, and 7, and that those counts may only be heard in the court of appeals under the principles expressed in *Telecommunications Research and Action Center v. FCC,* 750 F.2d 70 (D.C.Cir.1984) ("TRAC") and its progeny. *TRAC* held that where a statute commits review of final agency action to the court of appeals, the appellate court has exclusive jurisdiction to hear lawsuits alleging agency inaction where the relief sought might affect the court's future statutory power of review. Here defendants argue that counts 1, 2, 6, and 7 seek to compel the issuance of regulations "establishing general procedures and requirements to implement [FFDCA § 408]," as authorized by FFDCA § 408(e)(1)(c). Under the appellate review provision, FFDCA § 408(h)(1), challenges to the validity of regulations issued pursuant to FFDCA § 408(e)(1)(c) are reviewable by the circuit court only.

■ The court must address the issue of jurisdiction as a threshold matter, because absent jurisdiction the court lacks the authority to decide the case on any other grounds. *See Ticor Title Ins. Co. v. FTC,* 814 F.2d 731, 757 (D.C.Cir.1987) (Green, J., concurring) (holding that "lower courts must always wrestle with [jurisdictional issues] before reaching any questions of justiciability, since courts may not decide issues over which they lack jurisdiction"); *Tuck v. Pan American Health Organization,* 668 F.2d 547, 549 (D.C.Cir.1981) ("The federal courts are courts of limited jurisdiction, and they lack the power to presume the existence of jurisdiction in order to dispose of a case on any other grounds."); *Jamison v. F.T.C.,* 628 F.Supp. 1548, 1550 (D.D.C.1986) (holding that "TRAC" jurisdiction must be addressed first).

### A. TRAC and its Progeny

In *TRAC* the D.C. Circuit held that where the Communications Act committed exclusive jurisdiction to review final FCC action to the court of appeals, a petition alleging unreasonable delay and seeking a writ of mandamus to compel FCC action was also subject to the exclusive jurisdiction of the court of appeals. 750 F.2d at 78–79. Federal courts are empowered under the All Writs Act, 28 U.S.C. § 1651(a), to issue writs of mandamus necessary to protect their future jurisdiction. Because unreasonable agency delay could, as a practical matter, defeat appellate review of final agency orders, the *TRAC* court reasoned that the court of appeals had exclusive jurisdiction to hear suits seeking relief that might affect the circuit court's future jurisdiction, even where the agency had not issued a final order. *Id.* at 76. The court in *TRAC* determined that the district court lacked concurrent jurisdiction to hear the petition for mandamus based upon the well-established principle that where Congress by statute vests jurisdiction with a particular court, it cuts off original jurisdiction in other courts in all cases covered by the statute. *Id.* at 77.

■ Cases decided after *TRAC* have utilized a two-part test to determine whether jurisdiction to review agency action lies in the district court or in the court of appeals: (1) does the statute commit review of agency action to the court of appeals and (2) does the action seek relief that might affect the circuit court's jurisdiction? *Jamison v. FTC,* 628 F.Supp. at 1550 (holding that *TRAC* governed a request for injunction, in spite of constitutional claims, where the statute committed review of FTC action to the appellate court and future review was implicated). The second prong is broadly construed to favor appellate review. *Id.* However, where a statute contains no "single, overarching provision governing judicial review," but instead subjects "discrete agency actions" to specialized review provisions, actions taken under sections

silent as to appellate review are "directly reviewable in a district court under some appropriate head of jurisdiction, for courts of appeals have only such jurisdiction as Congress has chosen to confer upon them." *Cutler v. Hayes,* 818 F.2d 879, 888 n. 61 (D.C.Cir.1987) (holding that district court had jurisdiction to review alleged FDA inaction in the implementation of new drug regulations pursuant to FFDCA § 355 because no statutory provision committed direct review to the court of appeals); *see also Nader v. U.S. EPA,* 859 F.2d 747, 751 (9th Cir.1988) (holding EPA's rejection of rulemaking petition to revoke pesticide tolerance was not an order appealable to the court of appeals under FFDCA § 346a or § 348 where, by their plain terms, those sections only allowed appellate review of orders issued under subsections not implicated in the litigation). In *Cutler,* the D.C. Circuit distinguished claims of agency inaction under the FFDCA, because, unlike the statute at issue in *TRAC,* the FFDCA only commits certain specific agency actions to appellate court review. 818 F.2d at 888 n. 61. *Cutler* held that a challenge to FDA regulation of new drugs under FFDCA § 355 and associated charges of agency inaction did not belong in the court of appeals, because the appellate review provision, § 355(h), applied only to cases challenging the disapproval of new drug applications. *Id.,* citing *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 651, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973) (interpreting § 355(h) narrowly and endorsing district court jurisdiction to hear appeals from orders affecting new drug status). Likewise, in *California v. Reilly,* 750 F.Supp. 433 (E.D.Cal.1990), the court held that limited appellate review provisions of the FFDCA did not divest the district court of subject matter jurisdiction under 28 U.S.C. § 1331 to hear statutory or constitutional challenges to EPA action. In *Reilly* defendants argued that 21 U.S.C. § 348(g)(1), which provided for judicial review in the court of appeals for orders issued pursuant to 21

U.S.C. § 348(f), set forth the entire permissible scope for judicial review of EPA action or inaction pertaining to § 409 of the FFDCA. Subsection 348(f) addressed the procedure for objections and public hearings of EPA orders. Plaintiffs contended that their facial challenge to the EPA's dual system of regulating carcinogenic pesticides did not fall within the limited review provision. The court agreed with plaintiffs and narrowly construed the appellate review provision of § 348(g)(1) as limited to the provision's plain language. The court declined to interpret a claim of EPA nonenforcement of the Delaney Clause as having been brought "pursuant to § 409(g)" because it "related to the process of setting tolerances." *Id.* at 436 ("The Supreme Court has held that a provision which refers expressly to review of 'final orders,' as does § 409(g), does not encompass a claim under the Act simply because the claim is related to or may affect a 'final order,' but applies only to those claims 'literally' falling within the provision's scope.")

## B. Counts 1, 2, 6, and 7

■ As noted, jurisdiction over a challenge to agency action or inaction lies in the district court unless the statute at issue specifically commits jurisdiction to the court of appeals. *See Cutler,* 818 F.2d at 887 n. 61 ("[C]ourts of appeals have only such jurisdiction as Congress has chosen to confer upon them."). Here, defendants contend that the FFDCA appellate review provision at 21 U.S.C. § 346a(h)(1) requires this court to transfer claims 1, 2, 6, and 7 to the court of appeals. Section 346a(h)(1) provides direct court of appeals review over three types of agency action:

(1) "actual controversy as to the validity of any regulation issued under subsection (e)(1)(C);"

(2) "any order issued under subsection (f)(1)(C) or (g)(2)(C);" and

(3) "any regulation that is the subject of such an order."

Defendants rely solely on subsection (e)(1)(C) as the basis for their *TRAC* argument. Subsection (e)(1)(C) provides that "[t]he Administrator may issue a regulation—establishing general procedures and requirements to implement [§ 346a]." Defendants assert that counts 1, 2, 6, and 7 "all seek to compel the issuance of regulations that are in the 'general procedures' category," and thus, relief for counts 1, 2, 6, and 7 could only be issued pursuant to the authority of § 346a (e)(1)(C), thereby implicating the future jurisdiction of the court of appeals.

Count 1 challenges EPA's alleged failure to promulgate regulations governing tolerances for emergency exemptions under FIFRA § 18, as plaintiffs contend is required under 21 U.S.C. § 346a (1)(6). Count 2 challenges EPA's alleged failure to promulgate data requirements for tolerances, as plaintiffs contend is required under § 346a (d)(2)(A). Count 6 alleges that EPA has imposed of a 99.9th percentile policy that is a "legislative rule" in violation of the APA's notice and comment requirements at 5 U.S.C. § 553(b). Count 7 alleges that EPA has imposed a child and infant safety factor policy that is a "legislative rule," also in violation of APA notice and comment requirements. The court finds that *TRAC* does not apply to these claims, and therefore, jurisdiction as to counts 1, 2, 6, and 7 is proper.

It is clear under *TRAC* that jurisdiction over any claim of EPA action or inaction falling directly within the provisions of 21 U.S.C. § 346a (h)(1) would only be reviewable by the court of appeals. However, the court cannot conclude, in light of the decisions in *Cutler*, *Nader*, and *Reilly*, that counts 1, 2, 6, or 7 fall within any of the special review provisions of § 346a(h)(1). As stated in *Cutler*, the FFDCA has "no single, overarching provision governing judicial review." 818 F.2d at 888 n.61.

Courts have repeatedly cautioned that the *TRAC* analysis of the FFDCA is not comparable to the *TRAC* analysis of statutes with broader appellate review provisions. *See Nader*, 859 F.2d at 754 ("Since jurisdiction in the case before us is predicated on a statute [the FFDCA] significantly more restrictive than those under which a denial of rulemaking has been found reviewable, we find those cases of little utility.") Moreover, NRDC's position that *Florida Power and Light Co. v. Lorion*, 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985), which involved a challenge to the Nuclear Regulatory Commission under the Hobbs Act, expressed a general rule that review of agency inaction belongs in the court of appeals, has been flatly rejected. Responding to the same argument by NRDC, the Ninth Circuit described the holding in *Florida Power and Light* as "wholly a creature of statute." *Nader*, 859 F.2d at 754. "Nowhere did the [Supreme] Court intimate that it was ruling as a matter of general administrative procedure;" nor are courts "at liberty simply to apply the Court's reading of one statute to a separate dissimilar statute." *Id.*

The FFDCA does not define the term "general procedures," nor have defendants volunteered a definition. In fact, defendants provide no basis whatsoever for the assertion that each of the very different claims in this case should be classified as "general procedures."[2] Nor do they suggest what parameters might apply to the "class of claims" that fall under (e)(1)(C). Plaintiffs, on the other hand, offer the compelling argument that subsection (e)(1)(C) cannot apply to their claims because it governs discretionary action only. Subsection (e)(1)(C) provides that the Administrator "may" issue regulations pertaining to general procedures. Plaintiffs argue that their claims are based entirely

---

**2.** *National Coalition Against the Misuse of Pesticides v. Thomas*, 809 F.2d 875 (D.C.Cir. 1987); *Environmental Defense Fund v. Hardin*, 428 F.2d 1093 (D.C.Cir.1970); and *Continental Chemiste Corp. v. Ruckelshaus*, 461 F.2d 331 (7th Cir.1972), offered by NRDC in support of appellate review, are inapposite, because each involved claims explicitly encompassed by a direct appellate review provision.

upon the EPA's failure to take statutorily mandated actions, and thus, none of the counts falls within the appellate review provision for discretionary "general procedures." Defendants ask this court to expand the appellate review provision far beyond its plain language. Congress has carved out specific areas of the FFDCA for appellate review which do not encompass all of § 346a. *See Reilly,* 750 F.Supp. at 436. Thus, the court denies defendants' motions to dismiss counts 1, 2, 6, and 7 for lack of jurisdiction on the basis of *TRAC,* and finds that jurisdiction over those counts properly rests in this court.[3]

## II. STANDING: COUNTS 8 AND 9

Defendants EPA and NRDC argue that counts 8 and 9 should be dismissed because plaintiffs lack standing. Count 8 alleges that EPA failed to meet its published tolerance reassessment schedule under FFDCA § 408(q)(3). The FQPA amended the FFDCA § 408(q)(1) to require that EPA reassess all pre-existing pesticide tolerances under the revised standards, with reviews to be conducted in three phases: (1) 33% within three years, (2) 66% within six years, and (3) 100% within ten years. 21 U.S.C. § 346a(q)(1). Under FFDCA § 408(q)(2), EPA is instructed to give priority for reviewing tolerances and exemptions to those pesticide chemical residues that "appear to pose the greatest risk to public health." 21 U.S.C. § 346(q)(2). FFDCA § 408(q)(3) further requires EPA to publish a schedule for reviewing tolerances and exemptions established before August 3, 1996; however, it states explicitly that "the determination of priorities for the review of tolerances and exemptions pursuant to this subsection is not a rulemaking and shall not be subject to judicial review, except that failure to take final

action pursuant to the schedule established by this paragraph shall be subject to judicial review." 21 U.S.C. § 346(q)(3). On August 4, 1997, EPA issued a notice pursuant to FFDCA § 408(q)(3) announcing a schedule for reassessing tolerances which divided the pesticides with tolerances subject to reassessment into three groups. 62 Fed.Reg. 42020. Pesticides in Group 1 appeared to pose the greatest risk to public health and included organophosphates, carbamates, and organochlorines; pesticides identified as "probable human carcinogens" or "possible human carcinogens" for which EPA had quantified a "cancer potency;" high-hazard inert ingredients; and pesticides exceeding their reference dose at the time of scheduling. *Id.* Group 2 pesticides included any possible human carcinogens not classed in Group 1. Biological pesticides and "inert ingredients" were included in Group 3. According to the notice in the Federal Register, "in general, tolerances and exemptions for Group 1 pesticides will be subject to reassessment first, followed by groups 2 and 3;" however, "[w]hile the actual reassessment of the tolerances and exemptions in these three groups may not correspond directly with the three FQPA reassessment deadlines of August 1999, August 2002, and August 2006, this grouping reflects the overall scheduling priorities for tolerance reassessment." *Id.*

Although plaintiffs admit that EPA "did, in fact, complete reassessments for more than one-third of the existing tolerances by August 3, 1999," they complain that the agency "failed to meet the reassessment schedule that it published on August 4, 1997, because a substantial number of the tolerances that were actually reassessed prior to August 3, 1999 [were] not associated with Group 1 pesticides." Complaint at

---

**3.** NRDC also suggests that the court consider whether, under *TRAC,* jurisdiction over counts 3, 4, 5, 8, and 9 belongs in the court of appeals. Although NRDC did not move to dismiss these counts, the court is mindful of its obligation to "satisfy itself" of its jurisdiction, "even though the parties are prepared to

concede it." *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). However, for reasons similar to those expressed above, the court finds that it has jurisdiction to address counts 3, 4, 5, 8, and 9.

¶ 99. Count 8 alleges EPA was statutorily obligated to publish a reassessment schedule by August 1997, and that EPA was bound to proceed according to the strict terms and timetable of that schedule. Plaintiffs assert that EPA's failure to "take final action pursuant to the schedule" is subject to judicial review pursuant to FFDCA § 408(q)(3).

Count 9 alleges that EPA failed to develop and implement an estrogenic substances screening program pursuant to FFDCA § 408(p), which requires EPA to develop "no later than 2 years after August 3, 1996," and implement "no later than 3 years after August 3, 1996," a screening program to determine whether "certain substances may have an effect in humans that is similar to an effect produced by a naturally occurring estrogen." 21 U.S.C. § 346a(p)(1). Plaintiffs allege that EPA failed to use "validated test systems and other scientifically relevant information" as required by § 408(p)(1), and thus, it failed to implement a valid screening program by August 3, 1999, as required by § 408(p)(2). They contend that EPA's failure to implement a statutorily adequate endocrine screening program in a timely manner constitutes agency action that has been unlawfully withheld and entitles plaintiffs to relief under 5 U.S.C. §§ 702–706.

 Article III of the Constitution limits the jurisdiction of federal courts to resolving actual cases and controversies. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The question of standing involves both constitutional limitations on federal court jurisdiction as well as prudential limitations on its exercise. *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). To meet the "irreducible constitutional minimum of standing," a plaintiff must show: (1) he has suffered an injury which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there is a causal connection between the alleged injury and conduct that is fairly traceable to the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. The plaintiff bears the burden of proving standing. *Id.*

 Further, in order to secure judicial review under the APA, the plaintiff must satisfy the additional requirement of prudential standing. A plaintiff has prudential standing if his interests "arguably fall within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit." *Bennett*, 520 U.S. at 162, 117 S.Ct. 1154. The "zone of interests" test requires the court to discern the interests "arguably to be protected" by the statutory provision and then to determine if the plaintiff's interests are among them. *Nat. Cred. Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 492, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). This test does not require a showing of Congressional intent to benefit the plaintiff. *Id.* The plaintiff must show only that the interests affected by the agency action are arguably protected under the statute. *Id.* Prudential standing does not exist where the plaintiff's interests are so "marginally related to . . . the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit" or if the plaintiff is only an incidental beneficiary of a statutory provision. *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

Plaintiffs assert three injuries that flow from EPA's failure to meet its tolerance reassessment schedule (count 8) and its failure to develop and implement an estrogenic substances screening program (count 9). First, plaintiffs argue that EPA's failure to abide by its published schedule for pesticide tolerances, failure to publish proper notice for a proposed endocrine screening program, and failure to establish an endocrine screening program that uses appropriate validated test systems have

deprived them of "procedures" to which they were entitled. Second, plaintiffs assert that they were deprived of information needed for crop selection, product development and investment, compliance planning, and dissemination of product information to workers, farmers, and the general public. Finally, plaintiffs contend that they have been harmed economically due to product "deselection" of pesticides that have not been reassessed or that have been unfairly labeled "endocrine disruptors." They allege that manufacturers are deprived of a market for their products and that consumers are forced to use less effective, more expensive pesticide products. Furthermore, plaintiffs allege that they must expend money and resources educating their members and the general public about the safety of pesticide products to counteract misinformation and ignorance.

Defendants argue that plaintiffs' alleged injuries do not satisfy the first two elements of constitutional standing, because they are not concrete and particularized, actual or imminent, and there is no causal link between the alleged injury and conduct that is fairly traceable to the defendant. They further contend that EPA is not statutorily required to produce the information sought, and thus, plaintiffs cannot base a claim of standing upon procedural or informational injury. Rather, under plaintiffs' theory of standing, any failure to act by an agency would result in an informational injury because the public would be deprived of whatever information might flow from the action. The court agrees with defendants that the complaint does not allege a concrete and particularized injury that is causally linked to defendants' conduct, and therefore, it dismisses counts 8 and 9.

### A. Procedural Injury

In cases where a party has been accorded a procedural right to protect its concrete interests, "the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury." *Florida Audubon Society v. Bentsen,* 94 F.3d 658, 664 (D.C.Cir.1996). The mere violation of a procedural requirement, however, does not permit "any and all persons to sue to enforce the requirement." *Id.* Plaintiffs must demonstrate that the challenged governmental act will cause a distinct risk to a particularized interest. *Id.; see also Capital Legal Foundation v. Commodity Credit Corp.,* 711 F.2d 253, 258–60 (D.C.Cir.1983) (holding that allegation of improper process by an agency does not grant standing absent assertion of some personal injury).

### 1. Count 8: Tolerance and Exemption Reassessment Schedule

■ Plaintiffs' purported procedural injury fails because they have not identified a legally protected interest that has been infringed by EPA's alleged procedural shortcomings. Count 8 asserts that FFDCA § 408(q)(3) provides a private right of action to enforce the tolerance reassessment schedule, and thus provides standing for a comprehensive attack on that schedule. Plaintiffs are incorrect.

FFDCA provides for judicial review for failure to take final action pursuant to the schedule, 21 U.S.C. § 346(q)(3). Plaintiffs, however, have not alleged what obligations the schedule created that the EPA has failed to fulfill. The schedule published in the Federal Register did not provide that all Group 1 pesticides would be reassessed by August 1999; it merely indicated that Group 1 pesticides "generally" would receive priority in the reassessment process. Moreover, the notice made clear that the actual reassessments of pesticides in the three groups "[might] not correspond directly with the three FQPA reassessment deadlines of August 1999, August 2002, and August 2006." 62 Fed.Reg. at 42021. Plaintiffs have not identified any specific pesticide tolerance or exemption that has

not been reassessed in a timely manner. Indeed, they cannot do so, because the schedule does not set forth the dates when specific pesticides will be reviewed. The only dates provided under the schedule are the three FQPA reassessment deadlines, whereby 33%, 66%, and 100% of all applicable tolerance and exemptions must be reassessed. Indeed, plaintiffs concede that the EPA met, and even surpassed, its obligation to reassess 33% by August 1999.

Nor have plaintiffs pointed to any evidence that EPA has proceeded in a manner that prioritizes pesticides classified in Groups 2 or 3 over Group 1. Rather plaintiffs argue that the reassessment of some pesticides outside the Group 1 classification by the August 1999 deadline constitutes a procedural injury that provides grounds for standing. This argument amounts to a backdoor challenge of EPA's reassessment prioritization and is specifically forbidden by statute. FFDCA § 408(q)(3) states explicitly that "the determination of priorities for the review of tolerances and exemptions pursuant to this subsection is not a rulemaking and shall not be subject to judicial review." 21 U.S.C. § 346a(q)(3).

### 2. Count 9: Endocrine Disruptor Screening Program

The FFDCA contains no private right of action to enforce the endocrine disruptor screening program. Thus, plaintiffs have sued under § 10(a) of the APA. *See* 5 U.S.C. § 702. In addition to establishing constitutional standing, "to secure judicial review under the APA, [plaintiffs] must show that the injuries they assert fall within the 'zone of interests' of the relevant statute." *Animal Legal Defense Fund, Inc. v. Espy*, 23 F.3d 496, 499 (D.C.Cir. 1994). This doctrine embodies the principle that federal courts should not adjudicate general grievances.

■ Plaintiffs appear to argue that an agency's alleged noncompliance with a statute inherently causes a procedural injury. That assertion was soundly rejected

by the Supreme Court in *Lujan v. Defenders of Wildlife*, which held that the injury-in-fact requirement could not be satisfied by "assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently." 504 U.S. at 576, 112 S.Ct. 2130. The Supreme Court noted, "To be sure, our generalized-grievance cases have typically involved Government violation of procedures assertedly ordained by the Constitution rather than the Congress. But there is absolutely no basis for making the Article III inquiry turn on the source of the asserted right." *Id.* Moreover, while procedural rights are "special," *id.* at 573 n. 7, 112 S.Ct. 2130, the Supreme Court "has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest." *Florida Audubon*, 94 F.3d at 664; *California Forestry Assoc. v. Thomas*, 936 F.Supp. 13, 19–20 (D.D.C.1996) (holding that standing cannot be premised on a convoluted chain of conjecture). Thus, the court rejects plaintiffs' argument that the mere failure of EPA to abide by the tolerance reassessment schedule or to implement an adequate endocrine disruptor screening program provides a basis for procedural standing.

### B. Informational Injury

■ The court likewise finds plaintiff's alleged informational injuries inadequate to support constitutional standing because they are neither concrete and particularized nor do they constitute the type of "informational injury" recognized by the case law. Informational standing arises "only in very specific statutory contexts" where a statutory provision has "explicitly created a right to information." *Animal Legal Defense Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C.Cir.1994). Plaintiffs would have the court expand the boundaries of informational standing to encompass every

case alleging a governmental failure to implement or enforce any statutory provision simply because government action creates information.

Plaintiffs counter that they are alleging a deprivation of "specific" information to which they are entitled by statute, but their complaint indicates otherwise. Count 8 alleges denial of information about "the cumulative effects of exposure to compounds with common mechanism of toxicity," "data required to support the continuation of tolerances," and "information that EPA necessarily gathers and scientific determinations that EPA makes when making tolerance decisions under the FFDCA." (Complaint ¶¶ 100–01). Count 9 alleges that EPA's failure to implement "an appropriately developed substances screening program" has deprived them of "information needed for planning and investment decisions and of other important procedural rights." As defendants observe, this encompasses literally all of the information that "has been or ever will be produced by EPA" in implementing §§ 408(p) and (q). In reality, plaintiffs assert a right to the informational product of EPA's programmatic activities, information which has not been withheld or misrepresented, but simply has not yet been generated. Plaintiffs' argument for informational standing presses, under a different name, the same generalized grievance that the court has already rejected. *See Judicial Watch, Inc. v. FEC,* 180 F.3d 277, 278 (D.C.Cir.1999) (holding that an injury amounting to "no more than a generalized interest in the enforcement of law" does not support standing).

The cases cited in plaintiffs' opposition do not support their overly expansive interpretation of the concept of informational standing. In *Public Citizen v. Department of Justice,* 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989), the Court held that plaintiffs had standing to sue under the Federal Advisory Committee Act (FACA), where plaintiffs interested in monitoring the judicial selection process

had requested and been refused access to the ABA Committee's record and minutes. The Court likened a denial of information under FACA to an agency's denial of documents in response to a request under the Freedom of Information Act. The injury prong of the standing inquiry is satisfied in both instances because both statutes specifically provide for and are intended to promote "disclosure and public access" to the workings of government and a policy of "government in the sunshine." *Id.* at 449–51, 109 S.Ct. 2558. Similarly, in *FEC v. Akins,* 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), the Court held that voters' inability to obtain information about donor lists and campaign contributions that the Federal Election Campaign Act ("FECA") required organizations to make public satisfied the "injury in fact" requirement for Article III standing. Addressing prudential standing, the Court noted that statutory language permitting "any person aggrieved by an order of the Commission" to file suit in federal court, evinced a congressional intent to "cast the standing net broadly" and to eliminate traditional prudential concerns. The generalized nature of the plaintiffs' injury did not defeat standing because it was consistent with the purpose of the FECA, *i.e.,* "to help voters understand who provides which candidates financial support," *id.* at 20, 118 S.Ct. 1777, and because it directly related to voting, which is a core constitutional right. *Id.* at 25–26, 118 S.Ct. 1777. Likewise, in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), informational standing was based upon two provisions of the Fair Housing Act of 1968, which "conferred on all 'persons' a legal right to truthful information about available housing." The first provision made it unlawful for entities covered by the act to misrepresent the availability of a dwelling for rent or sale to any person on the basis of race, color, religion, sex, or national origin. *Id.* at 373, 102 S.Ct. 1114. The second provision rendered that right enforceable through the

creation of an "explicit cause of action." *Id.*

Each of the cases relied upon by plaintiffs involved a statute that explicitly created a right to information, thereby creating a basis for informational standing. The FFDCA is not such a statute. The FFDCA does not confer a broad, legally enforceable right to information. Section 408(p) does not require EPA to share the results of the endocrine disruptor screening program with the public. The only report that the agency is statutorily required to prepare is a report to Congress after the program has been in effect for four years. *See* 21 U.S.C. § 346a(p)(7). Although § 408(q) required the publication of EPA's reassessment schedule, it contains no other provision regarding public access to information. *See* 21 U.S.C. § 346a(q).

### C. Economic Injury

Finally, plaintiffs assert that they have suffered economic injury as a result of the uncertainty about pesticide safety created by the EPA's alleged failure to meet its tolerance reassessment schedule and to implement an adequate and timely endocrine disruptor screening program. Plaintiffs contend that "the enactment of FQPA and the EPA's related statements created uncertainty about the safety of certain pesticides and chemicals," and that "the FQPA, coupled with EPA's own schedule, required EPA to eliminate that uncertainty by August 1999." (Complaint ¶¶ 30, 99, 101, 108; Opposition at 36). Specifically, they claim economic injury as a result of having to expend funds on "public education and outreach" to combat "misinformation about crop protection and other chemical products" and as result of "product deselection" by consumers, growers, and pesticide manufacturers. (Complaint ¶¶ 102, 110–112; Opposition at 38.)

Plaintiffs economic claims fail for two reasons. First their alleged injuries are not concrete and particularized, and second, even assuming injury to a concrete interest, plaintiffs have not adequately demonstrated a causal connection between EPA's alleged inaction and their purported economic harm. Contrary to assertions in plaintiffs' opposition, the EPA was under no obligation to eliminate "uncertainty" about the safety of all pesticides and chemicals by August 1999. The complaint clearly recognizes that the reassessment process extends over a period of ten years through 2006. Nothing in the statute or schedule committed EPA to reassess all of the Group 1 pesticides by August 1999. The EPA was only obliged to reassess 33% of the total number subject to reassessment by the first statutory deadline, giving general priority to Group 1 pesticides. Plaintiffs concede in count 8 that EPA not only met, but exceeded, the statutory requirement to reassess 33% of the pesticide tolerances and exemptions by August 1999.

Plaintiffs suggest, without providing further detail, that they have been harmed by the fact that EPA reassessed some pesticides from Groups 2 and 3 ahead of certain pesticides in Group 1. However, they have not indicated which pesticides they manufacture or use, whether those pesticides are classified in Group 1, and whether any of the pesticides manufactured or used by plaintiffs were passed over for reassessment in favor of pesticides in Groups 2 or 3. Nor do plaintiffs point to a single pesticide product the use or marketability of which has been adversely affected by "uncertainty" allegedly created by EPA's reassessment schedule.

Plaintiffs also fail to allege a particularized injury flowing from EPA's failure to implement a valid endocrine disruptor screening program. The complaint is unclear about whether plaintiffs attribute product de-selection to tardy screening or to inaccurate screening results; *i.e.*, whether customers "de-select" products because they have not been screened, or because they have been screened and labeled "endocrine disruptors" using invalid tests. Plaintiffs' opposition, however, clarifies that their dispute lies with EPA's

alleged failure to meet deadlines, rather than with the substance of the endocrine disruptor screening program: "If EPA had ... met the statutory deadline for developing and implementing an ESSP, some or all of these products would no longer be under such a cloud." (Opposition at 39). Plaintiffs do not identify any particular pesticide product or chemical that has come under a cloud, been deselected, or been rendered unmarketable due to EPA's tardiness in implementing the screening program. The parties seem to agree that no deadline has passed for screening any particular subset of chemicals or issuing findings based upon the screening results. Rather, plaintiffs argue that focusing on specific deadlines "misses the point," because "EPA's own statements as well as those of other government agencies" have fed public uncertainty about the endocrinal effects of various products, and that uncertainty remains due to EPA's failure to "implement the ESSP" by August 3, 1999. (Opposition at 40). Because the statute is silent as to which pesticides are to be screened for estrogen mimicking effects and in what order, the only way for EPA to "remove the cloud of uncertainty" would be to complete the screening process for all pesticides. Plaintiffs cite no basis in the statute or the legislative history of the FFDCA to support the claim that EPA was obliged to *complete* endocrine disruptor screening on all pesticides subject to the regulation by August 1999. The statute only requires that EPA "implement the program" no later than three years after August 3, 1996, after obtaining public comment and review.

■ Moreover, plaintiffs have not demonstrated that their alleged injuries are traceable to EPA action or inaction. Even if agency action authorizes the conduct at issue, causation will not exist where "one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion' the courts cannot presume either to control or to predict." *Lujan,* 504 U.S. at 562, 112 S.Ct. 2130 (*quoting ASARCO Inc. v. Kadish,* 490 U.S. 605, 615, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989)). As EPA and NRDC point out, it was Congress' enactment of the FQPA, which mandated that all pesticides be reviewed and tested for safety, rather than any action by EPA, that cast a shadow of suspicion over the products that plaintiffs manufacture, sell, or use. Plaintiffs concede in their opposition that the enactment of the FQPA created doubt in the minds of consumers as to the safety of various pesticides. (Opposition at 36.) Congress, through the FQPA, dictated the three-tiered reassessment plan and placed the EPA's decisions prioritizing the reassessment of pesticide tolerance and exemptions beyond judicial review. *See* 21 U.S.C. § 346a(q). The FQPA also mandated the development of an endocrine disruptor screening program. Thus, any product deselection is attributable primarily to acts of Congress rather than to EPA decisionmaking. Furthermore, public statements by the Consumer Product Safety Commission or other advocacy groups decrying the safety of plaintiffs' pesticide products cannot be attributed to the EPA. *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (finding no standing where causal factors intervened). In cases involving the conduct of third parties, standing will be precluded when "multiple, tenuous links" connect the challenged conduct to the asserted injury. *Center for Auto Safety v. NHTSA,* 793 F.2d 1322, 1335 (D.C.Cir.1986).

The decision to devote resources to identify and counteract misinformation about pesticide products is also not fairly traceable to EPA's reassessment schedule or endocrine disruptor screening program. The D.C. Circuit rejected a similar argument in *National Treasury Employees Union v. United States,* 101 F.3d 1423 (D.C.Cir.1996) (*"NTEU"*), holding that plaintiffs lacked standing to challenge the Line Item Veto Act, despite claims that

the Act forced them to "expend additional time and money … to help ensure that the President does not thwart our legislative advocacy," and "reduce[d] NTEU's ability to advocate its members' views." *Id.* at 1426. Absent proof that the defendant's actions and the organization's mission were in "direct conflict," the court found that it was "entirely speculative" whether the defendant's conduct had actually impeded the organization's activities. *Id.* at 1430. "NTEU would have us accept as true not only the fact that it has expended additional funds in an attempt to lobby the President more effectively, but also the speculative conclusion that such expenditures are a necessary link in achieving the organization's ultimate purpose. This we decline to do." *Id.* An organization's budgetary choices do not provide adequate grounds for standing. *See Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1276 (D.C.Cir.1994). Here, although the court does not necessarily accept NRDC's argument that plaintiffs' true interest in this litigation is delay, there does not appear to be a "direct conflict" between the alleged inaction of the EPA in reassessing or screening pesticides and the goals of the various plaintiff organizations. Furthermore, it is not clear why the reassessment of some pesticides before others, when all must be reassessed sooner or later, necessitates waging a campaign against misinformation. This is a budget choice, not a "necessary link" in achieving plaintiffs' ultimate and varied purposes.

Accordingly, the court dismisses counts 8 and 9 for lack of standing.

## III. PROGRAMMATIC CHALLENGE: "DATA COLLECTION" COUNTS 2 THROUGH 5

Defendants argue four overlapping reasons to support dismissal of counts 2 through 5, the data collection counts: (1) failure to identify a statutory duty unlawfully withheld or unreasonably delayed; (2) failure to meet the final agency action requirement of the APA; (3) ripeness; and (4) failure to exhaust administrative remedies. The essence of defendants' criticism is that plaintiffs seek a wholesale review of EPA's approach to establishing and continuing pesticide tolerances and registrations, rather than challenging any individual, concrete agency action.

Only final agency actions and those made reviewable by statute are subject to judicial review under the APA. *See* 5 U.S.C. § 704. Reviewing courts are authorized to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §§ 706(1), (2)(A). Plaintiffs assert jurisdiction pursuant to APA § 706, which provides judicial review when agency action has been "unlawfully withheld" or "unreasonably delayed." 5 U.S.C. § 706(1). Count 2 alleges that EPA's regulations for establishing tolerances, set forth at 40 C.F.R. Part 180, do not specify with sufficient particularity under FFDCA § 408(d)(2)(A) the test data that EPA "in fact requires" to establish or maintain tolerances. (Complaint at ¶ 52). Count 3 charges EPA with failing to update the guidelines that specify what data the agency requires to support the registration of a pesticide, as it is required to do "from time to time" under FIFRA § 3(c)(2)(A). (Complaint at ¶ 55–58). Plaintiffs claim that "in practice" EPA "routinely requires more data to register a pesticide than what is listed in the guidelines," published at 40 C.F.R. Part 158. *Id.* Plaintiffs assert in counts 4 and 5 that EPA has failed to exercise its data collection authority under FFDCA § 408(f)(1) and FIFRA §§ 3(c)(2)(A) and (B), in order to collect additional information needed to support the continuation of existing tolerances and pesticide registrations. (Complaint ¶¶ 61–64).

Plaintiffs simplification of the matter as a "purely legal question" is unconvincing. Under plaintiffs' formulation of the controversy, the "legal question" posed by counts 2 and 3 is "do FIFRA and FFDCA require EPA to publish regulations to put interested parties on notice of the data that it requires to support tolerances and registrations, or is it free to impose such requirements on an ad hoc basis?" (Opposition at 46). The "legal question" allegedly posed by counts 4 and 5 is "does EPA have a statutory duty to identify, and provide registrants with an opportunity to generate, data that are 'reasonably required' to support the continuation of existing tolerances and registrations?" (Opposition at 48). These questions may not be simple or purely legal. For instance, plaintiffs state: "Far from claiming that 'existing data regulations and guidelines' are 'substantively inadequate' or require a 'complex factual inquiry' into EPA's regulations, Counts Two and Three allege that EPA is routinely imposing unpublished and ad hoc data requirements. In other words, the Agency is requiring applicants, as a condition of obtaining and maintaining tolerances and registrations, to submit substantial amounts of data that are not called for under applicable regulations." (Opposition at 46). Plaintiffs' proffer that no discovery would be necessary to answer these questions is plainly wrong. The court cannot issue an advisory opinion on what EPA is statutorily permitted to do. In order for the court to rule on whether it is unlawful for EPA routinely to impose unpublished ad hoc data requirements, plaintiffs would have to demonstrate that EPA actually engaged in the alleged conduct.

The more fundamental problem, which plaintiffs fail to address, is that courts have repeatedly refused to entertain the type of programmatic attack on the general day-to-day operations of the agency that the plaintiffs are waging here. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 899, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Plaintiffs do not challenge a single specific instance when the agency has refused to accept a petition to establish a pesticide tolerance for failure to include unspecified data. Nor do they allege a single instance when the EPA has denied a registration application. Rather, they ask the court to interfere in matters more appropriately left to the agency and to Congress. In *Lujan v. NWF*, the Supreme Court framed the problem as follows: "[R]espondent cannot seek wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made. . . . [A] regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that threatens or harms him." 497 U.S. at 891, 110 S.Ct. 3177. Plaintiffs cannot address "flaws in the entire program" by laying them out before the courts for "wholesale correction." *Id.* at 893, 110 S.Ct. 3177; *see also Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 85 (D.C.Cir.1991) (holding that the "right to seek judicial review" under 5 U.S.C. § 702 is premised on an "identifiable action or event" rather than general "day to day operations of the agency.")

A recent *en banc* decision by the Fifth Circuit is particularly instructive. *Sierra Club v. Peterson*, 228 F.3d 559 (5th Cir. 2000), relying upon *Lujan*, vacated the decision of the district court to grant injunctive relief, because the plaintiff environmental groups had not challenged a final agency action. Sierra Club and other environmental groups sought injunctive relief alleging that the Forest Service's even-aged management practice in Texas national forests violated the National Forest Management Act (NFMA). Plaintiffs cited twelve allegedly improper timber sales in support of their claims, but they made clear that the sales were only examples of

a larger pattern of misconduct. The Fifth Circuit rejected the notion that the Forest Service's failure to implement timber sales in compliance with the NFMA and regulations constituted a "final agency action," holding instead that the environmental groups' claims were nonjusticiable and "precisely the type of programmatic challenge that the Supreme Court struck down in *Lujan*," *id.* at 566, because the timber management program did not "mark the consummation of the agency's decision-making process." *Id.* Similarly, plaintiffs here do not challenge a single EPA decision to deny or cancel a tolerance or registration for any pesticide. Rather, plaintiffs merely cite the EPA's announcement of cancellation agreements for methyl parathion and azinphos methyl as *examples* of EPA's failure to implement the data collection provisions of FFDCA and FIFRA, but they do not challenge either agreement on that basis. (Opposition at 15).

## A. Counts 2 and 3

 Plaintiffs cannot maintain counts 2 and 3 under a "failure to act" or "unreasonable delay" theory because they have not identified any event that triggered the agency's duty to act, regardless of whether that triggering event was a fixed deadline or the fulfillment of "certain preconditions." *See e.g., Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir.1999) (declaring that the salient factor in determining whether agency action is "unlawfully withheld" or "unreasonably delayed" under APA § 706(1) is "whether Congress imposed a date-certain deadline"); *Sierra Club v. Thomas*, 828 F.2d 783, 792 (D.C.Cir.1987) (holding that "agency recalcitrance" amounting to the "abdication of statutory responsibility" is justiciable); and *Action on Smoking and Health v. Department of Labor*, 28 F.3d 162, 165 (D.C.Cir.1994) ("Agency action is final when it imposes an obligation, denies a right, or fixes some legal relationship."). Count 2 does not allege that EPA has failed to promulgate regulations for establishing tolerances; it merely claims that

those regulations lack specificity. Count 3 admits that the FIFRA data requirements have been amended "three times" since 1984, most recently in June 1993, but alleges that under its obligation to amend "from time to time," EPA must amend the published requirements before demanding any additional information from chemical manufacturers to support a registration. (Complaint at ¶ 57). Courts have steadfastly refused to permit plaintiffs to evade the APA final agency action requirement by recasting a disagreement with what the agency has done as a "failure to act" claim. *See Public Citizen v. Nuclear Regulatory Commission*, 845 F.2d 1105, 1108 (D.C.Cir. 1988) ("Almost any objection to an agency action can be dressed up as an agency's failure to act."); *Ecology Center, Inc. v. United States Forest Serv.*, 192 F.3d 922, 926 (9th Cir.1999) ("This court has refused to allow plaintiffs to evade the finality requirement with complaints about the sufficiency of an agency action dressed up as an agency's failure to act."). Counts 2 and 3 are therefore dismissed.

## B. Counts 4 and 5

 Judicial review of counts 4 and 5 is also inappropriate under APA § 706(1). The data call-in provisions at issue in counts 4 and 5 require EPA to issue a data call-in "if" the agency determines that additional data "are reasonably required to support the continuation of a tolerance or exemption" or "are required to maintain in effect an existing registration of a pesticide." 21 U.S.C. § 346a(f)(1), 7 U.S.C. § 136a(c)(2)(B). Plaintiffs reliance on *Adams v. Richardson*, 480 F.2d 1159 (D.C.Cir.1973), to argue that the EPA has abdicated its "statutory duty" to implement the data provisions of the FFDCA and FIFRA is misplaced. The D.C. Circuit in *Adams* held that HEW had abdicated its statutory responsibilities where, contrary to the intent of Congress, it continued to supply federal funds to state educational systems that it knew were in violation of

Title VI. In this case, EPA has not clearly contravened the purpose of Congress with respect to the data call-in provisions, and thus, its conduct does not rise to the level of "statutory abdication." Accordingly, counts 4 and 5 are also dismissed.

## IV. FINAL AGENCY ACTION: "SCIENCE POLICY" COUNTS 6 AND 7

Count 6 challenges EPA's policy of using the 99.9th percentile of acute dietary exposure (the amount of pesticide residue that a person might be exposed to over a single day) in performing the risk assessments necessary to set pesticide tolerances and determine whether those tolerances meet the FFDCA safety standard. Count 7 challenges "*ad hoc* changes" to EPA's policy of applying the FQPA's tenfold safety factor when assessing a pesticide's dietary risk to infants and children in the tolerance-setting process. Plaintiffs claim that in its regulatory decision-making EPA has consistently applied the 99th percentile and safety factor policies in a manner that has binding present and future effect on the regulated industry, without following the notice and comment procedures required under APA § 553(b). Defendants urge the court to dismiss counts 6 and 7 under Fed.R.Civ.P. 12(b)(1) or 12(b)(6), on the grounds that they do not constitute final agency action and are unripe, are general statements of policy not subject to notice and comment, or in the alternative, that plaintiffs have not exhausted their administrative remedies.

Taken together, 28 U.S.C. § 1331 and the APA provide the basis for federal subject matter jurisdiction over challenges to agency action or inaction. Absent a finding of "final agency action," however, the court lacks authority under the APA to hear counts 6 and 7. *See* 5 U.S.C. § 704. Likewise, the APA notice and comment requirements only apply to "final rules" and do not extend to interim rules or general policy statements. *See* 5 U.S.C. § 553.

■ Courts employ a two-part test to determine if agency action is "final:" (1) the action must mark the "consummation" of the agency's decision-making process and must not be of a "merely tentative or interlocutory nature," and (2) the action must be one by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotations omitted). "Agency action is final when it imposes an obligation, denies a right, or fixes some legal relationship." *Action on Smoking and Health v. Dept. of Labor*, 28 F.3d 162, 165 (1994) (citations omitted). The court also lacks jurisdiction to hear the science policy counts if the 99.9th percentile and ten-fold safety factor policies are general policy statements rather than substantive rules, because general statements of policy are not subject to the APA's notice and comment requirements. 5 U.S.C. § 553(b)(3)(A); *Bechtel v. FCC*, 10 F.3d 875, 878 (D.C.Cir.1993) ("Policy statements are exempt from the Administrative Procedure Act's notice-and-comment requirements, ... and hence may take effect without the rigors—and presumed advantages—of that process.").

When, as here, federal subject matter jurisdiction is dependent on the same statute that provides the substantive claim in the case, the jurisdictional question and the merits are intertwined. *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.1995). Thus, for purposes of counts 6 and 7, the "court is required to convert the Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion." *Id.* Thus, because discovery has not occurred and because the court has not been presented with materials outside the scope of the pleadings that are sufficient to rule on summary judgment, the court addresses counts 6 and 7 under the Rule 12(b)(6) standard.

Defendant EPA asks the court to take judicial notice of several Federal Register notices that declare the 99.9th percentile and tenfold safety factor policies to be non-binding guidance documents, subject to revision. On the strength of these notices, plus the fact that plaintiffs have not identified a single instance when the policies were administratively challenged, EPA argues that the court may dismiss counts 6 and 7 for lack of jurisdiction under Fed. R.Civ.P. 12(b)(1), or alternatively, for failure to state a claim under Fed.R.Civ.P. 12(b)(6). Plaintiffs respond that EPA's characterizations of the science policies as "guidance documents" is not dispositive, *see Appalachain Power Co. v. EPA,* 208 F.3d 1015, 1022 (D.C.Cir.2000); *NRDC v. EPA,* 22 F.3d 1125, 1132–33 (D.C.Cir. 1994), and the complaint clearly alleges that in practice EPA has treated these policies as final, binding rules. (Complaint at ¶¶ 72–75). EPA replies that even were the court to assume that the science policies were being applied as "binding rules," plaintiffs cannot demonstrate that the policies represent the consummation of the decision-making process, because it is "a matter of public record" that the agency is still taking comment on the policies. (Reply at 22). Moreover, EPA argues, the complaint is deficient because it does not allege a single instance when the agency has failed to exercise the discretion preserved for it by the science policies themselves.

■ Courts have struggled to define "final rule," and whether an agency action is subject to judicial review remains highly fact-bound. *See, e.g., Appalachian Power Co. v. EPA,* 208 F.3d at 1022–23; *Pacific Gas and Electric Co. v. Federal Power Commission,* 506 F.2d 33, 37–38 (D.C.Cir. 1974); *McLouth Steel Products Corp. v. Thomas,* 838 F.2d 1317, 1319–20 (D.C.Cir. 1988); *Bechtel v. FCC,* 10 F.3d 875, 878 (D.C.Cir.1993); *American Portland Cement Alliance v. EPA,* 101 F.3d 772, 776 (D.C.Cir.1996). While it is true that publi-cation in the C.F.R., the fact that the agency continues to take comments on the policy, and the agency's own characterization of the policy are all important factors for the court to consider in determining whether an agency has consummated the rule-making process and taken steps that alter or fix legal rights and obligations, none of these factors is dispositive. *See, e.g., Appalachian Power Co. v. EPA,* 208 F.3d at 1022. Nor do defendants provide legal support for the proposition that plaintiffs had to plead at least one specific instance when the agency failed to exercise discretion under the policy. Plaintiffs allege that 3000 pesticide tolerances have been reassessed since the FFDCA was amended by the FQPA and that EPA has consistently used the 99.9th percentile and the tenfold safety factor in a binding manner in assessing these tolerance reassessments and in conducting risk assessments to support cancellation agreements. (Complaint at ¶¶ 83, 92). Plaintiffs also allege that the change from a 95th percentile to a 99.9th percentile assessment has a substantial impact in terms of the practical legal consequences flowing from the decision and that application of the tenfold safety factor policy has resulted in the "outright revocation" of numerous tolerances and the consequent loss of many pesticides. (Complaint at ¶¶ 80, 90). Finally, plaintiffs assert that they submitted a petition to EPA seeking a rule-making on the 99.9th percentile of exposure and the tenfold safety factor policies, but that EPA did not respond to that petition.[4] The complaint further alleges that EPA's practice in implementing these policies constitutes a final rule, and the fact that EPA has not subjected this rule to notice and comment rule-making constitutes a violation of the APA.

■ While it is entirely possible, if not likely, that EPA could prove, after discovery, that its science policies do not qualify as final agency action or are not

---

4. EPA denies this allegation.

binding rules, at the 12(b)(6) motion to dismiss stage the court is required to "accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiffs." *Fitts,* 44 F.Supp.2d at 321 (D.D.C.1999). The court takes judicial notice of the Federal Register entries cited by the EPA, which describe the science policies at issue in counts 6 and 7. *See EEOC v. St. Francis Xavier Parochial School,* 117 F.3d 621 (D.C.Cir.1997); *Black v. Arthur,* 18 F.Supp.2d 1127, 1131 (D.Or.1998) ("[C]ourts are allowed to take judicial notice of matters in the general public record, including records and reports of administrative bodies and records of prior litigation, without converting a motion to dismiss into a motion for summary judgment."). But the court finds that these notices alone cannot defeat the fact that plaintiffs have set forth the necessary elements of a claim for failure to provide notice and comment rule-making under the APA.

Similar reasoning dispenses with plaintiffs' ripeness claim, which is premised upon acceptance of the agency's position that "further administrative actions are contemplated." (Motion to Dismiss at 36). *See Wyoming Outdoor Council v. United States Forest Service,* 165 F.3d 43, 50 (D.C.Cir.1999) ("A controversy is ripe if further administrative process will not aid in the development of facts needed by the court to decide the question it is asked to consider.") (quoting *New York State Opthalmological Soc'y v. Bowen,* 854 F.2d 1379, 1386 (D.C.Cir.1988)); *but see United States Telephone Association v. FCC,* 28 F.3d 1232 (D.C.Cir.1994) (holding that binding policy statement that had been applied in over 300 cases was ripe for review.) The court also rejects defendants' exhaustion claim. *See Darby v. Cisneros,* 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) (holding that federal courts may not require plaintiff to exhaust available administrative remedies before seeking judicial review under the APA, where the relevant statute and the agency rules do not mandate exhaustion.) Thus, defendants' motions to dismiss are denied with respect to counts 6 and 7.

## V. CANCELLATION ORDER FOR METHYL PARATHION: COUNT 10

Count 10 alleges that the EPA's approval of a cancellation request for methyl parathion violated FIFRA § 6(f)(1)(B) because the agency did not provide an adequate opportunity for notice and comment. *See* 7 U.S.C. § 136d(f)(1). Defendants initially moved to dismiss count 10 as seeking an advisory opinion, based upon their mistaken belief that plaintiffs had only complained of procedural violations in the cancellation process, unaccompanied by any challenge to the substance of the cancellation. However, it is clear from the complaint and opposition that plaintiffs challenge the cancellation order for methyl parathion, not merely an alleged procedural violation. Because the court finds that count 10 presents a true case or controversy, defendants' motion with respect to count 10 is denied.

## CONCLUSION

For the foregoing reasons, Defendants EPA and NRDC's motions to dismiss [52–1, 53–1] are granted in part and denied in part. NRDC's motion to sever and transfer counts 8 and 9 [53–2] is denied. Counts 2 through 5, 8, and 9 of the complaint are dismissed. Defendant EPA's motion for protective order [81–1] is denied as moot. A status conference is set for November 28, 2000 at 10:30 a.m.